**Bryan W. NICKERSON, Jr., Appellant,**

v.

**Josef KUTSCHERA, A. G. Berkinruth, the Tidewater Oil Company.**

**No. 17814.**

United States Court of Appeals
Third Circuit.

Argued Sept. 22, 1969.

Decided Dec. 23, 1969.

Hastie, Chief Judge, dissented.

Bryan W. Nickerson, pro se.

John D. Fairchild, Connolly, Bove & Lodge, Wilmington, Del., for appellee.

Before HASTIE, Chief Judge, and McLAUGHLIN and VAN DUSEN, Circuit Judges.

OPINION OF THE COURT

PER CURIAM.

This case is an appeal from the District Court order of January 22, 1969 (1) dismissing, with prejudice, an action for infringement of a patent which had previously been held invalid by the United States Court of Appeals for the Sixth Circuit, see Nickerson v. Bearfoot Sole Company, 311 F.2d 858 (6th Cir.), cert. den. 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed. 2d 50, rehearing den. 375 U.S. 949, 84 S.Ct. 343, 11 L.Ed.2d 279 (1963), and (2) entering final judgment for defendants under F.R.Civ.P. 54(b). The history of this present litigation may be found in Nickerson v. Kutschera, 390 F. 2d 812 (3rd Cir. 1968). After the record was returned to the District Court as a result of that decision, the District Court found, after reviewing the material revealed during the discovery process, that there was in fact no "new evidence" [1] different from that before the Sixth Circuit when it decided *Bearfoot Sole, supra,* and adopted the rule that in patent cases:

"* * * all issues determined in the first action should be binding in a different cause of action and should not

---

1. Although the docket entries call the proceeding on October 16, 1968, a "hearing" and defendants never had the reporter's notes taken at that proceeding transcribed (see Document 44), it seems clear that such proceeding was an argument on the Motion to Dismiss (Document 39) and no opportunity for offering testimony was afforded plaintiff (see Document 40, Motion for Trial, and Document 41, being order of 7/15/68 denying that Motion).

When the case was previously pending before this court (No. 16,651), counsel for defendants first advised the court that the District Court "specifically asked Mr. Nickerson during the hearing whether he had additional evidence supporting validity" (letter of 12/21/67) and subsequent-

ly, after reviewing the transcript of the hearing, wrote that "The Court did not expressly ask Mr. Nickerson whether he had any new evidence to present" (letter of 2/5/68). It is not necessary to decide plaintiff's contention that pertinent information in the exhibits and answers to interrogatories before the court at the October 1968 hearing was not available to him within a year of the final judgment in Civil No. 34,813, N.D.Ohio (cf. F. R.Civ.P. 60(b)), since our previous opinion made clear that there were two considerations which required that the case be reversed and remanded. The second consideration is referred to at 390 F.2d 815 and in the second paragraph of this opinion.

be allowed to be relitigated upon any ground whatever, absent fraud or some other factor invalidating the judgment in the first action."

We are no more willing to disregard a ruling of the Supreme Court of the United States on this record now than we were in March of 1968 when this case was previously before this court. In Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), that Court held:

> "Neither reason nor authority supports the contention that an adjudication adverse to any or all the claims of a patent precludes another suit upon the same claims against a different defendant. While the earlier decision may by comity be given great weight in a later litigation and thus persuade the court to render a like decree, it is not *res adjudicata* and may not be pleaded as a defense." Id. at 642, 56 S.Ct. at 647.[2]

It would seem clear that the court expected that "great weight" may be given to the "earlier decision" in the light of all the evidence on the patent's validity and there is no showing that the District Court considered the trial record in the former litigation. We continue to believe that such change as may be desirable in this exception in patent cases to the general rule of collateral estoppel should be made, on a record such as this, by the Supreme Court itself or by Congress, which so far has refused to change the rule in *Triplett*. In this regard, it is noted that, while the original version of the "Patent Reform Act of 1967"[3] introduced in the Senate contained a section providing for collateral estoppel in patent cases,[4] the present version of that Bill[5] has deleted this so-called "in rem invalidity" clause.

For the above reasons, the judgment of the District Court will be reversed and the case remanded for disposition on the merits in accordance with this opinion.

HASTIE, Chief Judge (dissenting).

This is the second appeal from an adverse judgment of the district court in appellant Nickerson's third suit for infringement of his original and reissue patents on attachable white sidewalls for vehicle tires. In the first action, the District Court for the Northern District of Ohio held Nickerson's patent valid and infringed. The Court of Appeals for the Sixth Circuit reversed, holding the patents invalid for want of invention. Nickerson v. Bearfoot Sole Co., 6th Cir. 1963, 311 F.2d 858, cert. denied, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50.

Nickerson brought a second suit for infringement of the same patents against a different defendant in the District of Delaware. The defendant's motion for summary judgment was granted on the ground that the judgment of the Sixth Circuit in *Bearfoot* precluded Nickerson from relitigating the validity of his patents even against a defendant who was not a party to the prior action and who was not closely enough related to a party or to the underlying controversy to have been bound by an adverse judgment in that action under current concepts of privity. Nickerson v. Pep Boys—Manny, Moe & Jack, D.Del.1965,

---

2. We can find nothing in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L. Ed.2d 610 (1969), cited by defendants during oral argument, to qualify the quoted language. In that case, the court used this language at pages 670–671, 89 S.Ct. at page 1911, thereby emphasizing that public interest considerations in patent litigation made it undesirable to apply automatically principles recognized in other civil cases:

> "We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued."

3. S. 1042, 90th Cong., 1st Sess. (1967).

4. See S. 1042, 90th Cong., 1st Sess. § 294 (1967).

5. See S. 1246, 91st Cong., 1st Sess. (1969).

247 F.Supp. 221. By allowing one who would not have been bound by a prior judgment to invoke the benefit of its preclusive effects, the district court declined to require mutuality of estoppel. Nickerson appealed the *Pep Boys* decision to this court, but the appeal was dismissed by agreement before argument.

In the present action, Nickerson has sued a third set of defendants for infringing the identical patents held invalid in *Bearfoot*. The same district court that decided the *Pep Boys* case once more gave the *Bearfoot* judgment the effect of collateral estoppel against Nickerson on the issue of patent validity, and dismissed the complaint in an unreported decision.

On the first appeal in this case, we affirmed "the general position of this court in Bruszewski v. United States, [3d Cir. 1950, 181 F.2d 419, cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632], that a strict rule of mutuality no longer has a proper place in the doctrine of *res judicata*." Nickerson v. Kutschera, 3d Cir. 1968, 390 F.2d 812, 815. It was our view in *Bruszewski*, and apparently on first appeal in this case as well, that, except for considerations of unfairness shown in a particular case, a party who as plaintiff had asserted a claim and had lost should not be heard again on the merits of that claim even in a second suit which he thereafter has instituted against a stranger to the original claim.[1] In *Bruszewski* we found unpersuasive

the game theory of justice[2] and the advocacy of symmetry in legal rules which at times have led to a contrary conclusion. We cited Coca-Cola Co. v. Pepsi-Cola Co., Del.Super.1934, 6 W.W.Harr. 124, 36 Del. 124, 172 A. 260, and agreed with the reasoning of the superior court that

> "a plaintiff who deliberately selects his forum and there unsuccessfully presents his proofs, is bound by such adverse judgment in a second suit involving all the identical issues already decided. The requirement of mutuality must yield to public policy. To hold otherwise would be to allow repeated litigation of identical questions, expressly adjudicated, and to allow a litigant having lost on a question of fact to re-open and re-try all the old issues each time he can obtain a new adversary not in privity with his former one."

6 W.W.Harr. at 133, 36 Del. at 133, 172 A. at 263. We also cited Bernhard v. Bank of America, 1942, 19 Cal.2d 807, 122 P.2d 892, and agreed with Justice, now Chief Justice Traynor that "no satisfactory rationalization has been advanced for the requirement of mutuality." 19 Cal.2d at 812, 122 P.2d at 895.

But even if the requirement of mutuality in collateral estoppel is thus abandoned in most situations, it has been argued that the complexity and uncertainty of judicial determinations of patent validity justify permitting a mul-

---

1. We expressed no opinion upon the situation where the party to be bound had not been the initiator of the claim in the first action. Subsequent federal cases have allowed the prior judgment to be invoked against a party lacking the initiative in the prior action. E. g., United Air Lines, Inc. v. Wiener, 9th Cir. 1964, 335 F.2d 379, 404, adopting on the issue of mutuality the opinion of the court below sub nom. United States v. United Air Lines, Inc., E.D.Wash., D. Nev.1962, 216 F.Supp. 709, 725–729; Zdanok v. Glidden Co., 2d Cir. 1964, 327 F.2d 944; United Banana Co. v. United Fruit Co., D.Conn.1959, 172 F.Supp. 580, 588–589. The present case does not require consideration of such a situation.

2. "If the rule itself is a curious one, the reason given for it is still more so :—'Nobody can take benefit by a verdict, who had not been prejudiced by it, had it gone contrary': a maxim which one would suppose to have found its way from the gaming-table to the bench. If a party be benefited by one throw of the dice he will, if the rules of fair play are observed, be prejudiced by another : but that the consequence should hold when applied to justice is not equally clear."

7 J. Bentham, Works 171 (Bowring's ed. 1843), quoted in Caterpillar Tractor Co. v. International Harvester Co., D.N. J.1940, 32 F.Supp. 304, 306.

tiplicity of such determinations concerning the same patent. One court has said that the issue of patentable invention "is as fugitive, impalpable, wayward, and vague a phantom as exists in the whole paraphernalia of legal concepts." Harries v. Air King Prods. Co., 2d Cir. 1950, 183 F.2d 158, 162. But however that may be, when the issue of validity has been carefully and completely considered and determined adversely to the patentee, there is no more reason for permitting its relitigation than the relitigation of a difficult or complex question that has been decided in any other field, particularly when one considers "the backlog of untried cases which clogs our federal courts. The latter are cases where the litigant asks only for his day in court, not a plurality of days * * *." Aghnides v. Holden, 7th Cir. 1955, 226 F.2d 949, 951 (Schnackenberg, J., concurring).

It is also argued, in support of permissiveness toward relitigation by a patentee after his first effort to vindicate his patent in court has failed, that the Patent Act provides that "[a] patent shall be presumed valid" and that "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it." 35 U.S.C. § 282. But this section merely confers a procedural advantage upon a patentee when the validity of his patent is challenged in litigation. It in no way suggests that, having lost the suit in which he enjoyed that advantage, he should be permitted to try again.

If the issuance of a patent is to be given weight in deciding whether a patentee should be able to invoke repeated judicial determinations of validity, it must be because the grant is attended by such careful and expert scrutiny that applications for patents on spurious or doubtful inventions will almost never be granted. But the evidence is to the contrary. See Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 1950, 340 U.S. 147, 154, 156–158, 71 S.Ct. 127, 95 L.Ed. 162 (Douglas, J., concurring); Packwood v. Briggs & Stratton Corp., 3d Cir.

1952, 195 F.2d 971, 974. The huge backlog of unprocessed applications and the desire to publish and maintain a record of all potentially useful discoveries seem to influence the patent office to be liberal in its grants. Wright, U. S. Patent System and the Judiciary, 1965, 47 J.Pat.Off. Soc'y 727, 727–28; Comment, Patent Policy and Invention, 1951, 46 Ill.L.Rev. 609, 613 n. 18. Indeed, patent office procedures and policy afford inventors every possible opportunity to secure patents through continuing applications, on the theory that "if time and energy are to be expended, even unnecessarily, it is much more desirable that such expenditure should occur at administrative levels." In re Hitchings, 1965, 342 F.2d 80, 85, 52 CCPA 1141. Although the patent examiners are experts in their field, the subsequent judicial determination of patent validity is not simply judicial review of administrative action, but an independent and definitive stage in the patent process. See Woodward, A Reconsideration of the Patent System as a Problem of Administrative Law, 1942, 55 Harv.L.Rev. 950, 959.

There was no occasion to discuss the foregoing considerations on the first appeal in this case. It was enough to say that "though we may agree that a strict requirement of mutuality should not be continued in the field of patent litigation, two considerations prompt us to reverse the lower court in this particular case." Nickerson v. Kutschera, 3d Cir. 1968, 390 F.2d 812, 815. The first controlling consideration was the assertion, made initially by Nickerson while arguing *pro se* in this court, that he had new material on the state of the prior art that had not been before the Court of Appeals for the Sixth Circuit when it held the patents invalid in *Bearfoot*. From the record on first appeal we could not judge whether the new evidence showed that Nickerson had not "fairly had his 'day in court' in the *Bearfoot* litigation," and we pointed out that "such a determination must first be made by the district court." 390 F.2d

at 815. The second consideration was that "affirmance of a new patent litigation estoppel rule in this case would be ill-timed" in view of the possibility of relevant Congressional action.[3] For those reasons, we reversed the district court's decision and remanded the case for appropriate disposition.

It seems to me that we thus indicated to the district court that it should consider whether Nickerson had anything new to present that would make it inequitable for the district court to treat the *Bearfoot* decision as controlling, with the unavoidable implication that, if the patentee had no new evidence, it would be proper to dismiss the action on the basis that his contentions had been fully considered and fairly adjudicated in *Bearfoot*.

Essentially, that is what the district court did. It granted a further hearing and then, in a careful opinion, analysed the alleged "new evidence" and concluded that it was neither "new" nor significant in a way that justified a reconsideration of the *Bearfoot* decision that the patent was invalid. The four items of new evidence revealed by the patentee's answers to interrogatories include: (1) a model of the Barnes prior-art patent, offered to show that the Sixth Circuit in *Bearfoot* failed to appreciate the essential structural inventive difference between the prior art and the Nickerson patent; (2) an affidavit explaining the importance of the model; (3) an affidavit by an employee of B. F. Goodrich Co. in Philadelphia stating that he was approached some time between the summer of 1951 and the fall of 1953 by a man interested in the development of attachable white sidewalls, apparently offered to negate the effect as prior art of a French patent published April 12, 1954; and (4) an affidavit by Barnes asserting that *Bearfoot's* production of sidewalls from Barnes' mold began early in 1955, offered to refute the finding in *Bearfoot* that the initial production date

was during the first few days of November.

As the court of appeals in *Bearfoot* was at pains to point out, the essential difference between the Barnes prior-art patent and the Nickerson patent lay in the means by which each sidewall was to be held against the vehicle tire. Barnes' drawings showed rigid metal springs at intervals around the circumference of the sidewall; Nickerson's sidewall was designed to press against the tire by virtue of the sidewall's resiliency and curved shape. But Barnes' sidewall was shaped similarly to Nickerson's, and the court of appeals in *Bearfoot* found that without the addition of the rigid springs, which in fact were never used, Barnes' sidewall would and did press against the tire as Nickerson's sidewall was designed to do, but never did. "If the inward bend of the Barnes side wall were exaggerated by Nickerson, the side wall would cling more tightly to an inflated tire; but the construction of such an exaggerated inward bend for such an objective would be obvious." Nickerson v. Bearfoot Sole Co., 6th Cir. 1963, 311 F.2d 858, 878. After reading the patent descriptions, examining the patent drawings, and scrutinizing the opinion of the Sixth Circuit, it is impossible to say that Nickerson's model and affidavit would have added anything to that court's complete understanding of the basically simple structures involved.

The affidavit of the B. F. Goodrich Co. employee is so vague that it could scarcely refute the effect of the 1954 French patent as prior art. But even if it could, the Sixth Circuit did not rely on the French patent as controlling, but merely noted that it revealed the principle of resilient construction approximately three years before Nickerson claimed it as the essence of his invention. 311 F.2d at 872.

The affidavit dealing with the production date of Barnes' sidewalls was offered to show that Bearfoot began pro-

---

3. To date, Congress has not acted on this subject, and we must now decide the merits of this appeal without legislative guidance.

ducing sidewalls without springs in early 1955 rather than in early November, 1954. But Nickerson's patent issued on October 12, 1954, and it is clear from the opinion of the Court of Appeals for the Sixth Circuit that the Barnes patent and the Barnes mold, both of which pre-dated Nickerson's patent by many months, were sufficient in themselves to establish the principle of structural elasticity as prior art.

The new evidence brought forward by Nickerson amounts to nothing more than a reargument of questions clearly presented and fairly determined in the *Bearfoot* litigation. Nickerson did not neglect to offer evidence in the Sixth Circuit that would have affected the judgment, and he has not discovered anything since the *Bearfoot* litigation reasonably calculated to change its result. There is no unfairness in precluding his suit on the ground of collateral estoppel that is not mutual.

Despite all of these considerations, a majority of the present panel find the second decision of the district court— and presumably the earlier one, though no such intimation appears in our decision on first appeal—to be erroneous because it is inconsistent with the ruling of the Supreme Court in Triplett v. Lowell, 1936, 297 U.S. 638, 642, 56 S.Ct. 645, 647, 80 L.Ed. 949, that "[n]either reason nor authority supports the contention that an adjudication adverse to any or all the claims of a patent precludes another suit upon the same claims against a different defendant." However, the Court immediately qualified that language by adding that "the earlier decision may by comity be given great weight in a later litigation and thus persuade the court to render a like decree * * *." In essence I think that is what happened here. The plaintiff was not preemptorily foreclosed from maintaining the present action because of the *Bearfoot* decision. Rather he was permitted to show any circumstances that would make it inequitable to follow *Bearfoot*. Only after he failed in that endeavor did the court treat the *Bearfoot* ruling on invalidity as controlling. I read Triplett v. Lowell, *supra*, as permitting disposition of the present suit in that manner, whether such disposition is viewed technically as an application of collateral estoppel or merely as following an earlier ruling on the same issue in the absence of a showing justifying reexamination of the issue.[4]

I would affirm the judgment of the district court.

4. There has been at least one recent indication that the Supreme Court may find the public interest in eliminating specious patents paramount to the patentee's interest in vindicating an invalidated patent through repeated suits for infringement. In Lear v. Adkins, 1969, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610, the Court rejected the traditional doctrine of licensee estoppel on the ground that if licensees are forbidden to challenge patent validity, "the public may continually be required to pay tribute to would-be monopolists without need or justification," since licensees are frequently "the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery." 395 U.S. at 670, 89 S.Ct. at 1911. Unless holdings of invalidity are given some preclusive force, the expensive prospect of defending an action for infringement brought under even an invalidated patent may suffice to force alleged infringers to pay royalties rather than challenge the patent as a defense. See Picard v. United Aircraft Corp., 2d Cir. 1942, 128 F.2d 632, 638, 641 (Frank, J., concurring). The result is that invalidated patents may have nearly as much force as valid ones, and the public may have to pay "tribute to would-be monopolists" even after a holding of invalidity.