**PHILIPS ELECTRONIC AND PHARMACEUTICAL INDUSTRIES CORP.,**
Appellant,

v.

**THERMAL AND ELECTRONICS INDUSTRIES, INC.**

No. 19085.

United States Court of Appeals, Third Circuit.

Argued April 19, 1971.

Decided Oct. 27, 1971.

---

4. In our view the application of *Miranti* should be strictly limited to similar fact situations.

Januar D. Bove, Jr., Connolly, Bove & Lodge, Wilmington, Del. (Russell G. Pelton, New York City, Jacob C. Kellem, James M. Mulligan, Jr., Wilmington, Del., on the brief), for appellant.

John M. Calimafde, Sandoe, Hopgood & Calimafde, New York City (Eugene J. Kalil, Michael Ebert, New York City, Lawrence I. Lerner, Newark, N. J., on the brief), for appellee.

Before SEITZ, ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This is an appeal from a judgment of the District Court of New Jersey in a patent infringement proceeding brought by Philips Electronic and Pharmaceutical Industries Corp. (PEPI) plaintiff-appellant against defendants, Glasseal Products, Inc. and Thermal and Electronics Industries, Inc. (T & E).[1] Plaintiff charged the defendants with infringement of PEPI's United States Patent No. 3,035,372 entitled "Method for Making A Glass to Metal Seal" (Mayers Patent). He sought a preliminary and final injunction against further infringement as well as compensation for damages. The defendant-appellee, T & E, denied infringement and offered evidence to show that the Mayers patent was invalid because the teachings it contained had been anticipated by the prior art, or were obvious to one skilled in the art. The cases against Glasseal[2] and T & E were consolidated, and tried. In his opinion, the trial judge held that patent no. 3,035,372 was invalid because of "obviousness" under 35 U.S.C. § 103. 311 F.Supp. 17 (D.N.J.1970). PEPI has appealed from this judgment.

## I. THE MAYERS PATENT

Appellant is the assignee of patent no. 3,035,372, originally issued to Karl F. Mayers on May 22, 1962, after lengthy proceedings in the United States Patent Office.[3] The patent describes a process for making air tight glass-to-metal seals which are highly resistant to mechanical and thermal shock. Such seals are used to conduct a lead, through a glass insulating member, to the inside of a larger device such as a capacitor, transformer, diode or relay. The seals provide a hermetically sealed electrical connection to the inside of the larger device, keeping it free of air, moisture and dust. In such electrical devices, internal hermeticity is required and an air tight seal is neces-

---

1. In a companion case, filed November 18, 1963, in the District Court for the District of Massachusetts, Judge Sweeney upheld the validity of the patent here in issue and found the defendant therein guilty of infringement. Philips Electronic and Pharm. Ind. Corp. v. Thermal Electronic Prod., 256 F.Supp. 705 (D.Mass.1966).

2. Following the trial in May and August 1968, Glasseal, one of the two original defendants in the infringement action, requested and received a license from the plaintiff under the Mayers patent. This

disposed of the suit against Glasseal, leaving T & E as the sole defendant and the only appellee in this action.

3. The plaintiff originally filed a patent application on March 17, 1951. This application was rejected on grounds of "obviousness" and unpatentability. The application was refiled on December 4, 1953 and rejected for the second time. Plaintiff abandoned these first two applications and on April 5, 1957, filed a third application which ultimately resulted in the granting of a patent on May 22, 1962.

sary. Because of the thermal and mechanical stresses to which these devices are subjected, the industry sought for many years to develop a seal which could withstand stress without cracking or leaking.

The Mayers patent described a method by which seals of high shock resistant qualities can be made. Both the patent office and the trial court found that the patent successfully fulfilled its purpose. The seals, consisting of an assembly with three components, an outer metal member or ring, an inner metal member which is the electrical conductor, and a glass intermediate member between the ring and the conductor, are vacuum tight. The seals are unified by the application of heat followed by a cooling process having utmost significance. The court below succinctly described the process:

> The first step in the process is to assemble the component parts of the seal in a jig. The seal as assembled is described as a mismatched seal. The mismatch is the result of a difference in coefficient of thermal expansion (CTE) of the component parts. The outer metal member of the seal must have a CTE substantially higher than the glass. The glass and inner members have approximately the same CTE. The assembly is subjected to heat until the glass melts and flows radially of its own weight. At that point the glass is stress-free. Annealing is the process of removing or minimizing stress in the glass. After the glass has reached the melting point, the entire assembly is rapidly but uniformly cooled. During this process the outer metal member (because of the difference in CTE) shrinks more rapidly than the glass and exerts compressive forces upon the glass. During the process the outer surface of the glass begins to harden and shrink but the inner part does not shrink proportionately because the glass is a poor conductor of heat. Cooling builds up stress in the glass and the more rapidly the glass is cooled, the greater the stress. By rapid and uniform cooling of the assembly, the interaction of the compressive force of the metal ring on the hardening surface of the glass, plus the forces created within the glass by differential of reaction by different rate of cooling of the inner part combines to build stress within the glass. The inner part which cools less rapidly than the outer surface exerts force against the hardening outer surface of the glass and, in turn, the more rapidly shrinking outer metal ring exerts compressive force against the surface of the glass. It is the combination of compressive force upon the outer surface of the glass while cooling and the expansive force of the less rapidly cooling inner part of the glass against the outer surface which creates and retains stresses in the glass which make it highly resistant to mechanical or thermal shock. Rapid cooling of glass creates stresses which can be undesirable because they are likely to rupture the glass either in process or upon subsequent shock. Slow cooling avoids this because it minimizes the relative difference in temperature of the inside of the glass and the outside surface. But it is alleged that the compressive force of a mismatched outer metal ring permits rapid cooling of the entire assembly without danger of rupture of the glass either in process or after production. 311 F.Supp. at 20–21.

PEPI claims this process produces a seal having a high resistance to mechanical or thermal shock. When molten glass is cooled it passes through what is known as the "annealing range." This is a temperature range in which internal stresses develop within the glass. If the cooling glass passes through this temperature range quickly, these internal stresses are retained in the hardened glass and it is fragile and susceptible to fracture or rupture. If the glass is gradually cooled and brought slowly through the annealing range, the internal stresses dissipate and the hardened glass tends to be stress

free and more resistant to shock. It had been the normal practice in the glass industry to "anneal" the glass as it cooled in order to eliminate the internal stresses and most glass-to-metal seals produced by the industry prior to the Mayers process were annealed.

The Mayers process does not involve annealing. In fact, the rapid cooling specified in the patent is designed to avoid annealing the glass, and to induce the stresses before thought hazardous. The seal produced utilizes both the stresses induced within the glass and the compressive force of the contracting metal ring. The alleged novelty of the Mayers process, therefore, lies in its utilization, through rapid cooling, of the internal stresses which the prior art had tried to avoid by annealing.

There was considerable evidence at trial to indicate the superior qualities of compression seals produced by this process as compared to those of the prior art. The evidence showed that these seals tend to be stronger, more durable, reliable and cheaper to produce than the earlier types. PEPI claims its commercial success has been impressive, and eleven other manufacturers have been licensed by PEPI to produce seals using this process.

In finding the Mayers patent invalid because of "obviousness," the trial court made an extensive analysis of the state of the art in the glass seal making industry prior to the alleged Mayers invention. T & E introduced evidence of four processes antedating the Mayers patent which, it asserted, either showed the Mayers process to be in prior use or anticipated in such a way as to make it invalid for "obviousness." Two of these processes, the Fuscite and RCA processes, were found by the trial court to be insufficient to meet the heavy burden of proof necessary to establishing prior use.[4] It is necessary to briefly discuss the other two of these processes in order to adequately deal with the questions raised on this appeal.

## II. THE PRIOR ART

### A. The German Patent.

On March 11, 1937, the German Patent Office issued patent no. 734,115. The German patent disclosed a three component type of compression seal, utilizing materials falling within the coefficient thermal expansion (CTE) range of the Mayers patent.

The trial judge found that the German patent anticipated appellant's claims with respect to the compressive stresses caused by mismatching CTE's. But, in the court's opinion, it did not anticipate the creation of tensile stresses within the glass member caused by rapid cooling. For this reason, the trial court concluded that, standing alone, the German patent did not anticipate the Mayers patent.

### B. The Lorenze Patent Application.[5]

The Lorenze patent application, dated November 3, 1941, was introduced by the appellee as an invention "described in a printed publication in this or a foreign

---

4. Evidence was adduced by the defendant through experts that these processes (Fuscite and RCA) represented a "prior use" of the rapid cooling technique. This prior use was intended to show that the techniques relied upon by Mayers for the "novelty" of his invention were not only · known to the industry prior to his invention but were in actual use. The trial court found that although the expert testimony was convincing as to "prior use," oral testimony uncorroborated by documented proof, was insufficient to meet the heavy burden of proof essential to es-

tablish a prior use. Burden of proving a prior use is clear and convincing proof. Jones Knitting Corp. v. Morgan, 361 F.2d 451 (3rd Cir. 1966).

5. The Lorenze patent application was filed in the German patent office on November 3, 1941. The application was microfilmed by the United States Office of Military Government for Germany subsequent to the Second World War. This microfilm, along with the many others duplicated by the United States Army was filed in the Library of Congress and made available to the public on June 4, 1948.

country." [6] The first claim of the Lorenze application states:

(1) [M]ethod of producing gas-tight metal-to-glass seals which are insensitive to temperature and in which compressive stresses are produced in the glass, characterized by the fact that the metal surrounds the glass and the mass of glass is rapidly cooled, immediately after completion of the melting process, by additional coolants from a temperature which lies above the transformation point.

For a prior publication to be sufficient to defeat a patent it must exhibit a substantial representation of the invention in such full, clear, and exact terms that one skilled in the art may make, construct and practice the invention without having to depend on either the patent or on his own inventive skills. Cummins Engine Co. v. General Motors Corp., 299 F.Supp. 59, 91 (D.Md.1969). Using this test, the trial court found that while the application clearly indicated a rapid cooling procedure in the making of seals, it did not provide diagrams, discuss the specific materials to be used or the exact nature of the seals. Nor was there an explanation of the importance of the selection of CTE in order to obtain the proper compressive stresses. For these reasons, the trial court concluded that the Lorenze application did not, standing alone, anticipate the Mayers patent.

Thus, the trial court concluded that not one of the four references relied on by the defendant to show "prior use" or "anticipation" of the Mayers patent was sufficient, standing alone, to invalidate the Mayers patent. It did find, however, that a combination of the knowledge contained in the two prior references, the Lorenze application and the German patent, provided all the essential elements of the Mayers process. It, therefore, concluded:

In summary, the prior art reveals knowledge of three component glass-to-metal compression seals with the same CTE's as Mayers [sic] process

in one reference and rapid cooling of gas tight metal-to-glass compressive seals in a separate reference. The prior art reveals all of the important elements of Mayers [sic] process.

\* \* \* \* \* \*

The two references viewed together would seem to suggest a combination of the German compression elements with the Lorenze rapid cooling process to produce a glass-to-metal seal. Accepting this reasoning, the Mayers patent would be invalid under 35 U.S.C. § 103.

311 F.Supp. at 37–38.

### III. APPELLANT'S CONTENTIONS

Appellant's preliminary contentions on this appeal are: (A) the trial judge erred when he admitted into evidence the microfilm of the Lorenze foreign patent application as a prior "printed publication" within the meaning of 35 U.S.C. § 102(a); and (B) the trial judge erred in concluding that the invention of the patent in suit would have been obvious to those skilled in the art in 1951 from a combination of the Lorenze foreign patent application and the German patent.

A. *The Admission of the Lorenze Microfilm.*

Section 102 of 35 U.S.C. provides:

A person shall be entitled to a patent unless—(a) the invention was \* \* described in a printed publication in this or a foreign country, before the invention thereof by the applicant.

Whether or not a microfilm qualifies as a "printed publication" is not a new legal issue. In Application of Tenney, 254 F.2d 619, 45 CCPA 894 (1958), the court found that the microfilm in question, also a German patent application, did not constitute a "printed publication." After a long treatment of the history of the "printed" publication requirement, Tenney found the essence of the requirement to be the *"probability"* of public knowledge—not its actuality—once it has been established that the item has been

---

6. 35 U.S.C. § 102(a).

both printed and published. Without proof of something more, it held that the mere existence of a microfilm copy did not alone create any presumption of public knowledge so as to constitute it a "printed publication" within the contemplation of Section 102(b). It also attached significance to the fact that the single extant microfilm copy had been misindexed. The concurring opinions, however, give considerable illumination to the majority decision because they disclose that under certain circumstances a microfilm can be held to be a printed document within the statutory meaning. Judge Worley believed that other factors were entitled to consideration, including not only the physical process utilized in the production or reproduction, "but also availability, accessibility, dissemination and, perhaps in some cases, even intent." 254 F.2d at 627. Judge Rich's concurrence, written in a similar vein cautioned that "no rigid rule about microfilm should be deduced, however, from our decision." 254 F.2d at 629.

Eight years later, the court in I. C. E. Corp. v. Armco Steel Corp., 250 F.Supp. 738 (S.D.N.Y.1966) was confronted with the similar question of whether or not a microfilm of a German patent application constituted a prior publication within the meaning of Section 102(a). After a careful analysis of *Tenney* and modern day document reproduction techniques, it concluded that under a motion for summary judgment it could not hold as a matter of law that a microfilm was not a "printed publication." It noted that the traditional methods of printing were not the only acceptable methods for the purposes of Section 102, particularly in the light of new developments. The paramount consideration, in the court's view, was whether or not the microfilmed material was "sufficiently acces-

sible to the public so as to constitute a 'publication' within the meaning of the statute." [7] 250 F.Supp. at 742.

It seems to us that the rationale of I. C. E. Corp. v. Armco Steel is sound. It finds support in modern copymaking techniques and the widespread commercial, industrial and educational use of microfilm, as well as its use in our libraries and data storage banks. Since the decision in *Tenney*, there have been revolutionary developments in techniques for reproduction, printing and dissemination of documents and data. The traditional process of "printing" is no longer the only process synonymous with "publication." The emphasis, therefore, should be public dissemination of the document, and its availability and accessibility to persons skilled in the subject matter or art.

█ The field is rapidly undergoing change and improvement. To restrict our interpretation of Section 102(a)'s "printed" publication requirement solely to the traditional printing press would ignore the realities of the scientific and technological period in which we live and the underlying rationale of Section 102. We hold, therefore, that the term "printed" as used in Section 102 can include documents duplicated by modern methods and techniques, including the now well established process of microfilming. Whether or not an individual microfilm is a "printed" publication within the meaning of the statute is *a question of fact* which ought to be determined by the application of criteria consonant with modern day methods of printing, duplicating and disseminating documents.

█ In considering a claim for infringement of a patent, the court in Garrett Corp. v. United States, 422 F.2d 874, 190 Ct.Cl. 858 (1970) adopted with

7. "[T]he term 'printed publication' as contemplated by Congress in 35 U.S.C. 102 can include a document printed, reproduced or duplicated by modern day methods, including microfilming, upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons inter- ested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation." 250 F.Supp. at 743.

approval the opinion of the trial commissioner which stated:

> To be a 'publication' under the statute, a document must, among other things, be accessible to the public. \* \* \* The public, for purposes of the statute, constitutes that class of persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents. \* \* Factors bearing on whether a document was published include the number of copies made, availability, accessibility, dissemination and even intent. In re Tenney, 254 F.2d 619, 45 CCPA 894 (1958).
>
> 422 F.2d at 877–878

Thus, a proponent of a microfilm as a "printed publication" under the statute should produce sufficient proof of its dissemination or that it has otherwise been made available and accessible to persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents. He should be able to make a satisfactory showing that a person interested in and ordinarily skilled in the art can locate it, and understand the essentials of the claimed invention without further research or experimentation. I. C. E. Corp. v. Armco, supra, 250 F.Supp. at 743.

■ By these criteria, did the microfilm of the Lorenze application constitute a "printed" publication within the terms of the statute? The Lorenze application was originally filed in the German Patent Office on November 3, 1941, and its availability for public inspection appeared in the German document "Patentblat" on July 30, 1942. The application was microfilmed by the United States Office of Military Government for Germany in 1947.[8] The microfilm was thereafter accessible in the Library of Congress in Washington, D. C. from June 4, 1948.[9] It was also listed in a document entitled "Bibliography of Scientific and Industrial Reports," Vol. 9, #10, dated June 4, 1948, and included under the heading "Patents" and subheading "Minerals and Mineral Products," and titled "Vacuum Fusions of Metal and Glass not Affected by Temperature." A printed abstract was lodged in the British Patent Office and made available to the public on November 1, 1948. The Bibliography indexing the microfilm was also available in a library in Stockholm, Sweden.

On the basis of the foregoing, the trial court found that the Lorenze application, as microfilmed and indexed, was available and accessible, with the exercise of reasonable diligence, to persons ordinarily skilled in the art. It held the document to be a printed publication under the statute, constituting a part of the prior art in the field.

■ The finding of fact of the trial court may not be set aside on appeal unless it is clearly erroneous. Fed.R.Civ.P. 52(a); Hoffman v. Lenyo, 433 F.2d 657 (3d Cir. 1970). While a patent application should not be regarded in itself as a printed publication under the statute, Celanese Corp. of America v. Ribbon Narrow Fabrics, 117 F.2d 481 (2d Cir. 1941), it can meet the "printed publication" requirement of Section 102(a) if it is published in printed form outside the patent office.

There was evidence that the microfilm of the Lorenze application was filed in the Library of Congress and was available to the public; that the Bibliography of Scientific Documents indexed the application and it was shown to also be on file in Sweden. There was also an abstract of the patent on file in the British Patent Office. This evidence is sufficient to support a finding that the information contained in the microfilm had been disseminated, and was available and accessible to a person interested and ordinarily skilled in the art.[10] Although

8. Identified by Reel #831 Class 32B, on page 13 in Fiat Technical Bulletin T–50, dated May 29, 1947.

9. On Reel No. 831, frames #8374–8377 and made available to the public.

10. In holding a thesis written by a patentee and filed in a college library available to students and to other libraries having exchange arrangement with the college to be in the "prior art," the court in Hamil-

the patent was indexed under the sub-heading "Minerals and Mineral Products," the trial judge noted that all of the other patent applications listed on the same index page pertained to devices or processes involving glass or glass metal combinations. His conclusion that the microfilm copy of the Lorenze application was not misfiled supports his finding that it was available to persons interested and could be located by persons ordinarily skilled in the subject matter with the exercise of reasonable diligence.

Upon the basis of the record before us, we are unable to state that the finding of the trial court that the Lorenze application was a printed publication within the meaning of Section 102(a) is "clearly erroneous."

### B. The Question of Obviousness

 The trial court, based on an analysis of the prior art in the glass seal making industry, concluded that the Mayers patent failed to meet the nonobviousness criteria of Section 103.[11] Appellant contends that this finding was erroneous because: first, the Mayers process was not obvious to those skilled in the art in 1951; and secondly, the trial court failed to consider important secondary considerations which have been suggested as relevant inquiries in determining obviousness. Graham v. John Deere Co., 383 U.S. 1, at 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Justice Clark, in the first major Supreme Court analysis of the 1952 Patent Act, stated in *Graham:*

> While the ultimate question of patent validity is one of law, [Great] A. & P. Tea Co. v. Supermarket [Equipment] Corp., supra [340 U.S. 147], at

155 [71 S.Ct. 127, 95 L.Ed. 162], the § 103 condition, * * * lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined.

383 U.S. at 17, 86 S.Ct. at 694.

It was, therefore, necessary for the trial court to ascertain the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art. Whether or not these basic factual inquiries are accurate must be judged under the clearly erroneous standard. Fed.R.Civ.P. 52(a); In re Northern Transatlantic Carriers Corp., 423 F. 2d 139 (1st Cir. 1970).

### 1. The Factual Inquiries

#### (a) The Prior Art.

 The trial court found that the scope of the prior art encompassed the teachings of the German Patent and the Lorenze Patent application. It determined that, while neither of these references individually contained all of the elements of the Mayers process, a combination of the two did disclose all of the important elements suggested in Mayers. Accordingly, it held that the prior art revealed all of the important elements of the Mayers process.

We believe that the evidence supports the trial court's determination. We are not persuaded by appellant's attempt to distinguish the "rapid cooling" procedure contemplated by the Lorenze appli-

---

ton Laboratories v. Massengill, 111 F.2d 584, at 585 (6th Cir. 1940) found that the thesis constituted a publication within the terms of the statute.

11. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between

the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made." 35 U.S.C. § 103.

cation from that found in Mayers process. Appellant argues that the Mayers process heats the molten glass to a higher temperature than any of the prior art processes and then begins an immediate "rapid cooling" procedure, resulting in a higher temperature differential between the surface area and internal portions of the glass as it passes through the annealing range. This technique allegedly increases the tensile stress ultimately retained in the solid glass by maximizing the stress as the glass passes through the annealing range. Assuming arguendo that this technique does maximize the stress, this distinction between Lorenze's "rapid cooling" and Mayers' is addressed only to the *amount* of stress induced. The critical question, however, in determining the validity of the Mayers patent is not the *amount* of any tensile stress that is induced but whether the technique of inducing *any* tensile strength was taught by the prior art.

### (b) *The Difference between the Prior Art and Mayers Patent*

The trial court found that all of the individual elements of the Mayers process were contained in the prior art. It correctly concluded that this fact, in itself, did not invalidate the Mayers patent unless the *combination* of these elements would have been obvious to the ordinary skilled worker in the art. See United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

### (c) *Level of Skill in the Art*

■ The question of obviousness is highly dependent upon the skill of the ordinary worker in the art. If the incremental knowledge added by the patent to the prior art is a result of the applica-

tion of mere mechanical skill by one familiar with the art, then the standard of invention has not been met. The Supreme Court formulated a general condition of patentability in 1851 in Hotchkiss v. Greenwood,[12] holding:

> [U]nless more ingenuity and skill * * * were required * * * than were possessed by ordinary mechanic, acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. In other words, the improvement is the work of the skilful mechanic, not that of the inventor.

11 How. 248, at 267, 13 L.Ed. 683.

The trial court, presented with voluminous examples of the prior art, noted the development of the metal-to-glass seal industry up to, and including, the German Patent and the Lorenze Patent application. The RCA and Fuscite processes (see footnote no. 5, supra), although found insufficient to prove "prior use," indicated a developing skill in the field. Compression seals, their advantages, and the effects of annealing and non-annealing on tensile stresses, were known in the art. John Gallup, a well qualified expert in glass technology, testified that as a person skilled in the art, he would have combined the teachings of Lorenze and the German Patent.

The trial court having made the factual inquiries prescribed by *Graham*, then turned to the final question of obviousness and concluded that the combination of the three component mismatched CTE elements of the German Patent with the rapid cooling procedure of the Lorenze application would have been obvious to a person having ordinary skill in the art.[13] The findings of fact

---

12. Section 103, added to the Patent Code in 1952, as an additional test of patent validity, "was intended merely as a codification of judicial precedents embracing the *Hotchkiss* condition, with congressional direction that inquiries into the obviousness of the subject matter sought to be patented are a prerequisite to patentability." Graham v. John Deere Co., 383 U.S., at 17, 86 S.Ct. at 693.

13. In reaching this conclusion, Judge Shaw stated: "Both references deal with glass-to-metal seals; both refer to achieving compression; the Lorenze application discusses tensile stresses and how compressive stress can avoid the dangers caused by such tensile stress; and one skilled in the art would realize that rapid cooling, advocated by Lorenze, creates tensile stresses. The two references viewed

made by the district court and the conclusion that the Mayers process would have been obvious to one skilled in the art are supported by the evidence. In reaching this determination, we "give considerable weight to its [district court's] factual determinations underlying the decision of obviousness even though that issue is one of law which we shall rule ourselves. * * * Findings of fact in patent cases are not to be set aside unless clearly erroneous under Federal Rule of Civil Procedure 52(a)." Ralston Purina Co. v. General Foods Corp., 442 F.2d 389, at 391 (8th Cir. 1971).

### 2. *Secondary Considerations.*

■ Appellant strenuously argues that the trial court erred in failing to give adequate attention to important secondary considerations. Mr. Justice Clark indicated in *Graham* that secondary considerations might have relevancy as indicia of obviousness or non-obviousness. These secondary considerations, also referred to as "subtests of non-obviousness," have been developed to help solve problems involving the judicial application of the "nonobvious" standard.[14] They are not decisive, however. Continental Can Co. v. Old Dominion Box Co., 393 F.2d 321 (2d Cir. 1968). Also see Continental Can Co. v. Crown Cork & Seal Co., 415 F.2d 601 (3rd Cir. 1969), cert. denied, 397 U.S. 914, 90 S.Ct. 916, 25 L.Ed.2d 94 (1970). Although the trial judge gave notice that he was aware of them, he chose not to rely on them. Nonetheless, in view of the contention of the appellant that it was error to disregard the secondary considerations, we have elected to examine them.

Appellant points enthusiastically to the commercial success Mayers-type compression glass-to-metal seals have enjoyed with the use of the patented method, their importance to the electronics industry, national defense and the space effort. Courts have given measured weight to "commercial success" as a secondary consideration in an effort to determine the absence of obviousness. Frank W. Egan & Co. v. Modern Plastic Machinery Corp., 387 F.2d 319 (3rd Cir. 1967).

In support of his contention, appellant placed in evidence its Annual Sales Summary for the years 1943 to 1967. It first employed the Mayers process in the production of glass-to-metal seals in 1953. The summary shows a doubling of PEPI's sale of glass-to-metal seals in the first ten years following the introduction of the Mayers process. This increase loses much of its significance, however, when we note that PEPI's sale of seals in the five years immediately *preceding* the introduction of the Mayers process shows a thirty fold increase.[15] 1950 net annual glass-to-metal sales of PEPI increased over 1949 sales by over three hundred percent. The following year, 1951 sales of PEPI again increased over five hundred percent above the preceding year. In dollar amount, this was the most significant increase in sales in the history of the company and *preceded* the use of the Mayers process.

For the next five years, following the introduction of the Mayers process, the annual sales remained rather static except for 1956 when sales increased over 1953 by about twenty-five percent. The Annual Sales Summary loses additional significance when one considers that dur-

---

together would seem to suggest a combination of the German compression elements with the Lorenze rapid cooling process to produce a glass-to-metal seal. Accepting this reasoning the Mayers patent would be invalid under 35 U.S.C. § 103." 311 F.Supp. at 38.

14. See Subtests of Nonobviousness: A Nontechnical Approach to Patent Validity. 112 U.Pa.L.Rev., 1169 (1964).

15. PEPI Annual Sales Summary: Net Sales Amount

| Year | Amount | |
|------|--------|---|
| 1948 | $147,600 | |
| 1949 | 200,400 | |
| 1950 | 617,200 | |
| 1951 | 3,315,700 | |
| 1952 | 4,241,700 | |
| 1953 | 4,222,500—Mayers Process introduced |
| 1957 | 5,290,300 | |
| 1962 | 9,500,000 | |

ing the nineteen fifties there has been a massive growth of the electronics industry, accompanied by a tremendous expansion of the budget of our government in its space, missile and military programs. The evidence discloses that this type seal is the one predominantly used in the production of missiles, rockets, satellites and all military equipment which must meet stringent shock specifications. In addition, through all of these years there has been an inflationary price push which also would have been reflected in the dollar value of gross sales. These facts indicate that, although PEPI has successfully increased its sales of glass-to-metal seals since 1953, factors other than the Mayers process may have been responsible.

PEPI also asserts that there had been a long felt but unfilled need in the industry for stronger seals. In support of this contention PEPI cites a list of patents granted in the art prior to the Mayers application. This list allegedly shows the number of unsuccessful attempts to produce a stronger seal. The evidence adduced at trial, however, indicates that the industry was a developing one and that the skill in the art was producing increasingly better seals. By the time Mayers process was developed, the record indicates that stronger seals were being produced by several other methods, i. e., the RCA and Fuscite processes. This evidence, although not sufficient to prove a prior use, indicates an advanced state of the art wherein stronger seals were being produced to meet the demand.

There is no substance to the appellant's argument of commercial acquiescence in the patent: that is, a widespread adoption by the industry after introduction of the patented solution. Appellant emphasizes that eleven manufacturers of glass to metal seals have accepted licenses under the patent to date. But it is quite possible that these licensees found acquiescence less burdensome and costly than the expense and problems involved in patent litigation. See Preuss v. General Electric Co., 392 F.2d 29 (2nd Cir. 1968). The breakdown of royalties earned from each licensee up to and including the first quarter of 1968 aggregates less than $200,-000.00.[16] There do not appear to be any major companies in this group. RCA is not included. Infringement suits have not been commenced against General Electric Company, Texas Instruments or IT&T.

Although the appellant makes no allusions to it, we note an adverse consideration in the history of this patent at the patent office. Although the alleged invention was conceived as early as 1950, the ultimate patent was not issued until May 22, 1962, after a long and tortuous course in the patent office. It is another illustration of what Judge Learned Hand has referred to as the "ant like persistence of solicitors" which overcomes "the patience of examiners, and there is apparently always but one outcome." See Lyon v. Boh, 1 F.2d 48, 50 (S.D.N.Y. 1924).

C. *Comity*

Finally, the appellant contends proper consideration was not given to the finding of the Massachusetts district court (Philips Electronic & Pharm. Industries Corp. v. Thermal Electronic Prod., 256 F.Supp. 705 (D.Mass.1966)) which upheld the validity of the Mayers patent or to the finding of the patent office which issued the patent in the first instance. It argues that reversible error was committed in holding that the presumption of validity stemming from the patent of-

16. PEPI's annual sales summary discloses sales figures for four years, 1963 through 1966, of glass to metal seals aggregating $24,763,000. The royalty figures of the eleven licensees are only available in this record on a five year basis. They aggregate $194,782.13. This constitutes but a small fraction of PEPI's sales for the same period. On the basis of three percent royalties, the gross sales of the eleven licensees for the five year period amounts to only $6,450,000. There are no figures available in the record for the bulk of the industry.

fice had been overcome and in refusing to follow the Massachusetts case. The trial court concluded that since neither the German patent per se nor the Lorenze patent per se was before the patent office or the Massachusetts court, the presumption had been overcome. The appellant contends, however that in substance the same art was before the patent office and the Massachusetts court.

Where relevant prior art is not considered by the patent office, the presumption of validity of the patent is weakened or overcome. Ralston Purina Co. v. General Foods Corp. 442 F.2d 389 (8th Cir. 1971); Dole Refrigerating Co. v. Amerio Contact Plate Freezers, 265 F.2d 627 (3rd Cir. 1959). An analysis of this record reveals that in substance the same art was not before the patent office or the Massachusetts court.

Appellant also vigorously argues that the trial court failed to provide proper comity to the Massachusetts decision. We do not agree. T & E was not a party to the Massachusetts proceeding and therefore is not bound by its decision. Nickerson v. Kutschera, 419 F.2d 983 (3rd Cir. 1969); Edward Valves, Inc. v. Cameron Iron Works, Inc., 286 F.2d 933 (5th Cir. 1961). Moreover, the Massachusetts district court was not provided with the above references to the prior art dealing with "rapid cooling." Nor do we believe the references cited to be the same in substance. In such case, where relevant prior art was not before the court, its decision has little precedential value. Judge Shaw was not bound to follow the Massachusetts court, not only because the parties were not the same, but also in the light of new and persuasive evidence regarding the prior art.[17]

We find that none of the points raised by the appellant have merit. The judgment of the court below will be affirmed.

17. In Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Court held that a finding of *invalidity* might form the basis for a plea of estoppel in a subsequent case in another court charging infringement of the same patent. The case sub judice, however, involved a previous finding of *validity* of the patent and pertinent new evidence, not considered by the prior court, was presented.