**MANNESMANN DEMAG CORPORATION,**
Plaintiff,

v.

**ENGINEERED METAL PRODUCTS COMPANY, INC., Defendant.**

**Civ. A. No. 83–24–WKS.**

United States District Court,
D. Delaware.

March 4, 1985.

---

Arthur G. Connolly, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Del., Fritz L. Schweitzer, Jr., Michael A. Cornman, Mandeville and Schweitzer, New York City, for plaintiff.

R.H. Richards, III, Richards, Layton & Finger, Wilmington, Del., Marshall A. Burmeister, Francois N. Palmatier, Burmeister, York, Palmatier, Hamby & Jones, Chicago, Ill., for defendant.

## OPINION

STAPLETON, Chief Judge.

This is a patent infringement action between two companies involved in the manufacture of electric arc furnaces. Mannesmann Demag Corporation ("Mannesmann") has charged Engineered Metal Products Company, Inc. ("EMPCO") with infringement, inducing infringement and contributory infringement of various claims of United States Patent No. 4,207,060 "Vessel For Metal Smelting Furnace" ("Zangs" or "Zangs patent"). EMPCO denies infringement and has counterclaimed seeking a declaration that the patent-in-suit is invalid.

EMPCO is a corporation of the State of Delaware. Mannesmann is a corporation of the State of Michigan. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1338(a), and venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b). This opinion constitutes my findings of fact and conclusions of law with respect to validity and infringement.

## I. BACKGROUND FACTS

An electric arc furnace is an apparatus designed to produce steel from metal scrap. The structure of a typical electric arc furnace in the early 1970's included a vessel consisting of an outer steel shell lined inside with refractory brick, with three electrodes extending through the roof and into the vessel.

The electric arc furnace functions as follows: the furnace is "charged" when the furnace roof is removed and scrap metal is dropped into the vessel. The electrodes are lowered into the scrap where the "arc" is struck between the electrodes and the scrap, thereby causing the meltdown. The vessel is then tilted and the melted scrap or charge is poured out. The electrodes are subsequently lifted, the roof is swung away, and the electric arc furnace cycle begins again with the introduction of a fresh charge.

The electric arc furnace is unique among furnaces because of the severe conditions under which it operates. Extreme mechanical stresses are created when tons of metal scrap are dumped from above into the vessel; mechanical stress is further compounded by the tilting of the vessel to dispose of the melt. More significantly, electric arc furnaces are exposed to extremely stressful thermal conditions. The temperature around the electrodes reaches 6000 ° C (11,000 ° F). Moreover, the furnace must withstand frequent huge fluctuations of temperature since each melting cycle lasts only several hours.

Until the early 1970's, the industry attempted to protect the steel shell of the furnace from the extreme conditions encountered therein by lining the vessel wall completely with refractory brick. The use of refractory, however, was not a wholly satisfactory solution, since the refractory itself is subject to considerable wear. As a result, furnace operations were periodically halted in order to install new refractory linings. These interruptions led to a decrease in production and accounted for a considerable percentage of operating expenses.

During the early and mid-1970's, water cooled "box type" panels and other panels of different design were introduced to replace refractory in portions of the furnace vessel outside of the smelting zone. Some of these designs did not literally replace refractory, but instead functioned to cool the refractory and prolong its life.

The patent-in-suit purports to be a solution to the problem of refractory wear above the smelting zone in electric arc furnaces, as well as a significant and novel improvement over the box type and other water-cooled panels previously mentioned. Basically, the Zangs patent teaches a vessel that has an interior wall formed, at least in part, by a cooling pipe coil. The pipe coil is composed of pipe sections arranged in a contacting relation. The specifications in the patent declare that the construction of the furnace wall from pipe coil solves the problem of thermal stress by permitting the forced guidance of cooling water through the pipes, thereby prolong-

ing the life of the furnace. Also, the specifications claim that the cooling coils disclosed in the Zangs patent are aptly suited to withstand the mechanical stress characteristic of electric arc furnaces. The patent-in-suit also purports to obviate the need for any refractory lining above the smelting zone.

The Zang specifications also point out that a layer of slag or melt forms on the pipe surfaces facing the interior of the vessel, and that the slag layer acts as a thermal insulator and further reduces thermal stress. This slag layer forms when slag in the smelt zone is splashed onto the coil panels during furnace operations. To enhance slag adherence, the pipes facing the interior are equipped with prominances such as burls.

EMPCO concedes that its accused devices are water-cooled pipe panels especially designed for use in electric arc furnaces, and that the accused devices have been sold in the United States.[1]

The accused panel comprises a plurality of eccentrically spaced pipes. "Eccentrically spaced" means that alternating pipe sections are positioned with their centers in different planes. In addition, each pipe section of the accused device is separated from its neighbor by a space which EMPCO claims has the important function of acting as a dovetail shaped keyway to receive and anchor a protective layer of solidified slag on the pipes. The spaces between the pipe sections of the accused device are completed by a slag-stopper or space bar inserted into the space and allegedly designed to prevent the egress of slag through the panel itself. The EMPCO panels also show a backbone bar, which is a support structure welded to alternate pipe sections on the exterior side of the panel. Finally, on the face of the pipes facing the interior of the vessel, the accused panel shows numerous diagonal "slag-catching" bars that slope in opposite directions on alternate pipe sections to lengthen the downward path of the molten slag and thereby improve slag adherence to the pipe surfaces.

Dr. Ludger Zangs, the inventor of the device disclosed by the patent-in-suit, filed a German patent application for the same device on October 11, 1977, No. P 27 45 622.0–24. The German application was granted as German patent DE 27 45 622 C2. The Zangs U.S. patent application was filed in the U.S. Patent and Trademark Office on June 26, 1978. The U.S. application was accorded the priority benefit of the German application, pursuant to Section 119 of the Patent Act. 35 U.S.C. § 119. On June 10, 1980, the U.S. Patent and Trademark Office granted the Zangs U.S. Patent No. 4,207,060.

A document of some importance to this litigation warrants a brief description. The so-called "Demag brochure", published in Germany by Mannesmann Demag AG, the parent company of the plaintiff, is a promotional flyer advertising a device under the commercial name "TW 2000" that fits the description of the device disclosed by the Zangs patent. The Demag brochure was the first piece of promotional material relating to the TW 2000 system that was published by the parent company in Germany. The date, "6.77," appears on the back of the brochure.

## II. THE PRESUMPTION OF VALIDITY

■ The Zangs patent is presumed valid. 35 U.S.C. § 282. This presumption may be overcome only by evidence that demonstrates invalidity clearly and convincingly. Moreover, the Court of Appeals for the Federal Circuit has recently held that the presumption of validity is neither weakened nor destroyed by pertinent prior art not considered by the Patent and Trademark Office, and that 35 U.S.C. § 282 requires a court to presume that the patent is useful, novel and nonobvious as well as not subject to a statutory bar. *Leinoff v. Louis Milona and Sons, Inc.*, 726 F.2d 734, 738 (Fed. Cir.1984) (citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.

---

1. See Defendant's Post-Trial Answering Brief at    24.

1983)); *TP Laboratories v. Professional Positioners*, 724 F.2d 965, 971 (Fed.Cir. 1984); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1567 (Fed. Cir.1983).

## A. *The Section 102(b) Bar Issue*

EMPCO argues that Zangs patent is invalid under Section 102(b) of the Patent Act because the Demag TW 2000 brochure or prospectus (PX–8) was published more than one year prior to the June 26, 1978 filing date of the U.S. patent application.[2]

EMPCO contends that the date appearing on the Demag brochure, "6.77," is the date that the brochure was actually published. In support of this argument, EMPCO points to certain information arising from the proceedings on the German patent application, No. P 27 45 622.0–24, filed October 11, 1977, corresponding to the U.S. patent-in-suit (DX–65, parts 1–9). The German patent application resulted in the issuance of German Patent No. DE 27 45 622 C2, which was followed by the filing of five oppositions.[3] Benteler-Werke AG filed one of the oppositions (DX–65, part 6; English translation), citing the Demag brochure as prior art, and included with its opposition a copy of the page of the brochure showing the "6.77" date. In reference to the Demag brochure, Benteler-Werke stated in pertinent part: "Enclosed is a prospectus sheet issued in June 1977 (cf. the printing notation in the lower right hand corner) by the predecessor in title of the patent holder. . . ."

The patent attorneys for plaintiff's West German parent company, Mannesmann AG, responded to the various oppositions (DX–65, part 7; English translation), and with respect to the Demag TW 2000 brochure, replied:

"REFERENCE 7 (prospectus page Demag—Opposition Benteler)

"The prospectus page appeared four months prior to the deposition of the application. The pipe wall shown is merely presented schematically and on a smaller scale so that the clearance between the pipes and the jacket is not recognizable.

EMPCO argues that the above-quoted reply by Mannesmann AG constitutes an admission that the TW 2000 brochure was *published* at least as early as June 11, 1977; that is four months prior to the German filing date of October 11, 1977. Accordingly, EMPCO argues that the brochure is subject to the Section 102(b) statutory bar, since it is a prior art printed publication, published more than one year prior to the June 26, 1978 U.S. filing date.

Mannesmann in turn argues that the "6.77" date appearing on the Demag brochure does not represent the date of publication but merely reflects the date that the brochure was *printed*. During the testimony of one of plaintiff's expert witnesses, Mr. Winfried Fettweiss, the plaintiff introduced into evidence the "minutes" of a meeting attended by Dr. Zangs and top executives of Mannesmann Demag AG in Duisberg, Germany on June 28, 1977. (PX–98; English translation). The minutes reflect that the subject of the meeting was the TW 2000 system. Mr. Fettweiss testified that, pursuant to the internal practices of his company, the Demag prospectus would not have been publicly distributed until sometime after the June 28, 1977 meeting. (Tr. 55–56).

Page three of the minutes refers to a "prospectus" and reads in pertinent part as follows:

Attempting further activities:

Publication in Stahl and Eisen.

Letter action by way of representatives with prospectus.

Mr. Fettweiss explained that the first "further activity" listed in the minutes,

2. Section 102(b) provides in pertinent part:
   A person shall be entitled to a patent unless—
   (b) the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States.

3. All of the oppositions were pending at the time of the post-trial briefing in this case.

"Publication in Stahl and Eisen," contemplated publication of the prospectus in a periodical known as "Stahl and Eisen," which enjoys widespread distribution throughout the European steel industry. (Tr. 55). Mr. Fettweiss indicated that the second activity, referred to as a "letter action" in the minutes, related to the initiation of a mailing campaign—"sending these brochures to all the subs and representatives worldwide for distribution." (Tr. 56).

Finally, Mr. Fettweiss testified that it was the policy of Mannesmann Demag AG at the time of the June 28, 1977 meeting that printed prospecti, such as the Demag TW 2000 brochure, were not distributed until company approval had been obtained. (Tr. 56). Thus, plaintiff argues that it escapes the statutory bar of Section 102(b) since distribution of the Demag brochure was not authorized until the meeting of June 28, 1977, and actual distribution would not have occurred until sometime thereafter.

■ It is well-settled that in determining whether a printed document constitutes a publication bar under 35 U.S.C. § 102(b) "the touchstone is public accessibility." *Application of Bayer*, 568 F.2d 1357, 1359 (C.C.P.A.1978). "The public, for purposes of [Section 102(b)], constitutes that class of persons concerned with the art to which the document relates and thus most likely to avail themselves of its content." *Philips Elec. & Pharmaceutical Indus. Corp. v. Thermal & Elec. Indus., Inc.*, 450 F.2d 1164, 1171 (3d Cir.1971) (quoting *In re Tenney*, 254 F.2d 619 (C.C.P.A.1958)). The burden is upon the party asserting that the document in question is a "printed publication" within the meaning of Section 102(b) to "produce sufficient proof of its dissemination or that it has otherwise been made available and accessible to persons concerned with the art...." *Philips*, 450 F.2d at 1171; *Tyler Refrigeration Corp. v. Kysor Indus. Corp.*, 553 F.Supp. 279, 283 (D.Del.1982).

■ Based on the foregoing principles, I find that EMPCO has failed to show that the Demag brochure was disseminated to the pertinent public prior to the critical date of June 26, 1977. Indeed, the current record is practically devoid of evidence that persons who would have been interested in the TW 2000 system advertised in the Demag brochure were familiar with or had access to that brochure prior to June 26, 1977. Absent more, the mere fact that the Demag brochure was dated, "6.77," is hardly evidence that the brochure was actually disseminated to the relevant public as of that date.

I am also unpersuaded by EMPCO's argument that Mannesmann's response to the Benteler-Werke opposition constituted an admission that the prospectus was actually published prior to June 11, 1977. In replying to the opposition, the German representative for Mannesmann Demag AG merely stated that the TW 2000 prospectus "appeared" four months prior to the German filing date. Based on the record before me, I am unable to construe the plaintiff's admission that the brochure "appeared" in June of 1977 to also mean that the brochure was disseminated or otherwise made available to the interested public during that period.

Furthermore, any inferences of public distribution that might arise from the "6.77" date appearing on the Demag brochure, or the Mannesmann representative's remark that the prospectus "appeared" four months prior to the German filing date is more than offset by Mr. Fettweiss' testimony, and the evidence introduced by plaintiff. Based on all of the evidence, I believe it more likely than not that the Demag TW 2000 prospectus was not distributed to the industry until sometime after the June 28, 1977 meeting.

### B. *Anticipation*

■ To be patentable, an invention must be new at the time of its discovery. This novelty requirement is one of the essential prerequisites of patentability. 35 U.S.C. § 102. The test for lack of novelty, i.e., anticipation, is one of strict identity. "To anticipate a claim, a prior art reference must show each and every element

claimed." *Leinoff v. Milona & Sons, Inc.,* 726 F.2d 734, 738 (Fed.Cir.1984); *General Electric v. United States,* 572 F.2d 745, 768, 215 Ct.Cl. 636 (1978). Anticipation will be found only if "all elements of a claimed invention arranged as in the claim" can be found in a single prior art reference. *Connell v. Sears, Roebuck & Company,* 722 F.2d 1542, 1548 (Fed.Cir.1983). Since the requisite degree of identity is rarely found, anticipation has been termed a "technical defense." *Shaw v. E.B. & A.C. Whiting Co.,* 417 F.2d 1097 (2d Cir.1969); *Walker v. General Motors Corp.,* 362 F.2d 56, 58 (9th Cir.1966).

EMPCO contends that claim 1 of the Zangs patent is invalid under 35 U.S.C. § 102 because it is anticipated by the Olsson patent (DX–46) and the Lindblom patent (DX–47).

■ Anticipation is to be determined by reference to the claim language of the patent whose validity is in question. Expressed another way, anticipation is determined by whether a claim "reads on" the prior invention or reference. Thus, if every element of claim 1 of the Zangs patent can be found in the Lindblom or Olsson invention, claim 1 is anticipated and therefore invalid.

■ Applying these principles, I conclude that the defendants have failed to adduce clear and convincing evidence that claim 1 of the Zangs patent is anticipated by the Olsson and Lindblom inventions.

Claim 1 of the Zangs patent reads as follows:

A vessel for a metal smelting furnace having a smelting zone including a heat-resistant interior wall, and cooling means for protecting the interior of said vessel, characterized by

(a) at least a portion of the internal wall of said vessel above the smelting zone consisting of at least one cooling pipe coil;

(b) said coil including fluid passage-forming sections;

(c) said cooling pipe coil being exposed to the center of the vessel, and

(d) neighboring sections of said coil being arranged in a contacting relation.

Both the Lindblom and Olsson patents relate to improvements in the design of submerged arc furnaces. Claim 1 of the patent-in-suit on the other hand teaches "a vessel for a metal smelting furnace." EMPCO argues that the phrase "metal smelting furnace" encompasses the submerged arc furnaces taught by the Lindblom and Olsson patents. Mannesmann contends, however, that the phrase "metal smelting furnace" cannot be read on these furnaces. EMPCO acknowledges that the anticipation issue turns on whether a "metal smelting furnace" can be read to include a submerged arc furnace.

The reference in claim 1 of the Zangs' patent to "a vessel for a metal smelting furnace" must, of course, be read in the context of the specifications of the patent. Those specifications explain that the "object of the patent" is to provide a vessel for "an electric furnace, of the type mentioned above [i.e., an electric arc metal smelting furnace], which is of a simple, relatively light, structure and relatively inexpensive to manufacture." (PX–9, Col. 2, 11. 11–16). Accordingly, the only furnace taught in the specifications is an electric arc furnace used to melt or "smelt" scrap metal. EMPCO's experts, Mr. Frost (Tr. 292), as well as Mannesmann's experts, Messrs. Lovgren and Fettweiss, agreed upon this fact.

Given the specifications, Mr. Fettweiss testified that, from the perspective of a metallurgical engineer familiar with furnaces, claim 1 is properly understood as referring to a vessel for an electric arc metal smelting furnace and as not including a submerged arc furnace. He explained that an electric arc metal smelting furnace is used to smelt metal while a submerged arc furnace is used to smelt ore. He points out, accordingly, that the only furnace taught in the Zangs' patent is charged with scrap metal while the furnaces taught by Lindblom and Olsson are charged with ore and involve an entirely different technology. (Tr. 379–393). Mr.

Lovgren agreed with this testimony. (Tr. 466). Mr. Frost felt that the reference in claim 1 to a "metal smelting furnace" was broader than the reference in the specifications to an electric arc metal smelting furnace but did not explain why he viewed the claim in this manner or what he considered to be encompassed by the phrase. (Tr. 325).

I consider Mr. Fettweiss to be well qualified by education and experience in the industry and found the explanation for his opinion to be convincing.[4] While Mr. Frost is an engineer, he disavowed being an "engineering expert in arc furnaces," (Tr. 372), and, as noted, did not comment on the differences between an electric arc metal smelting furnace and a submerged arc ore smelting furnace.[5] On this basis, I credit Mr. Fettweiss' testimony and find that claim 1 of the Zangs patent does not encompass submerged arc furnaces.

EMPCO's argument to the contrary relies primarily on inferences it seeks to draw from the file wrapper. (DX–63). First, EMPCO points out that claim 1 of the Zangs patent application, as originally filed (DX–63), was limited to an electric arc furnace, since it read: "Vessel for metal smelting furnace, particularly electric arc furnace." By the preliminary amendment filed June 26, 1978, the applicant replaced claim 1 with claim 26, which left out the reference to an electric arc furnace, and merely called for a "vessel for a metal smelting furnace." Claim 26, after various amendments became patent claim 1, which continues to refer only to a "metal smelting furnace." EMPCO argues that the applicant, by deleting the original claim 1 reference to an electric arc furnace, intended to broaden the claim to cover any "metal smelting furnace."

Neither of the two inferences most readily drawn from these facts is of any aid to

EMPCO, however. Given the narrow scope of the specifications, the most logical inference is that the applicant was using the phrase "metal smelting furnace" and the phrase "electric arc furnace" as synonymous for purposes of the patent and that the latter phrase was deleted from claim 1 as redundant. Alternatively, one might infer that the applicant understood that an electric arc furnace was not the only kind of "metal smelting furnace" and that he intended to claim the use of his coil panels in all types of metal smelting furnaces. However, even if there be furnaces other than electric arc furnaces that are used to smelt metal, this record would not support a conclusion that claim 1 extends to furnaces like the submerged arc furnace, which are used to smelt ore.

Second, EMPCO notes that both the examiner and the applicant cited prior art references relating to various types of furnaces other than electric arc furnaces. Accordingly, EMPCO argues that neither the examiner nor the applicant considered claim 1 to be limited solely to an electric arc furnace. It would not be necessary, however, for a furnace to come within the phrase "metal smelting furnace" in order for it to be arguably relevant prior art under Section 103. Moreover, as noted above, the fact that there may be other "metal smelting furnaces" does not mean that this phrase includes furnaces used to smelt ore.

It is true that the applicant's attorney filed a "Supplemental Prior Art statement," which used the phrase "metal smelting furnace" to describe a blast furnace which is apparently utilized for smelting ore. However, I do not think this single reference of counsel should alter the reading which the remainder of this record indicates that a practitioner of the art would give to claim 1 in the context of the

---

**4.** Fettweiss has a master's degree in metallurgical engineering. For a time, he was employed as an engineer in charge of startup operations for submerged arc furnaces. From 1979 until the present, he has been employed by Mannesmann as a product manager for electric arc furnaces in the United States. (Tr. 15–18).

**5.** Mr. Frost affirmatively testified that he did not "view any single reference [in the prior art] alone as showing absolutely the totality of what is recited" in claim 1. (Tr. 321–322).

specifications. In short, I conclude that Lindblom and Olsson do not anticipate the Zangs patent.

In addition to claiming that the Demag brochure constitutes a statutory bar under Section 102(b) as previously discussed, EMPCO also claims that the brochure invalidates various claims of the Zangs patent on the ground of anticipation under 35 U.S.C. § 102(a).[6]

The Demag TW 2000 brochure was issued by "DEMAG Metal Production." Dr. Zangs' name does not appear on the brochure; nor is there any other indication from the brochure that Dr. Zangs might have been the originator of the TW 2000 technology. Accordingly, EMPCO argues that Mannesmann failed to show that Dr. Zangs was the source of the disclosures contained in the brochure. Thus, it is said, the brochure must be taken as a printed publication by others that clearly anticipated the Zangs invention under Section 102(a). However, other than to point out the absence of Dr. Zangs name from the Demag brochure, EMPCO provided by someone other than Dr. Zangs.

Mannesmann, in contrast, made a persuasive showing that the TW 2000 system was indeed the invention of Dr. Zangs. EMPCO has failed, therefore, to show by clear and convincing evidence that the Demag brochure was anticipatory prior art under Section 102(a).

Mr. Fettweiss testified that Dr. Zangs was employed by Mannesmann Demag's research and development group in West Germany at the time that the TW 2000 system was developed. (Tr. 25). As previously discussed, Mr. Fettweiss also indicated that Dr. Zangs attended the June 28, 1977 meeting of Mannesmann executives relating to the TW 2000 system. More importantly, Fettweiss testified that he was "knowledgable" concerning development of the TW 2000 technology and that Dr. Zangs was indeed the creator of that sys-

tem. (Tr. 25–26, 412). Fettweiss explained that the TW 2000 system was Mannesmann's commercial embodiment of the Zangs invention, and that the Demag brochure at issue was one of a number of items of sales literature utilized by Mannesmann to advertise its TW 2000 technology (Tr. 25–32).

Fettweiss further testified that Dr. Zangs traveled to various parts of the world delivering papers and lecturing to the steel industry about his invention as embodied in the TW 2000 system (Tr. 57). In this regard, Mannesmann introduced into evidence a paper dated October 1978 describing the TW 2000 technology that was authored by Dr. Zangs. (PX–21).

Based on the uncontradicted evidence of record, I find that the Demag TW 2000 brochure is a description of Dr. Zangs' invention. Accordingly, the Demag brochure does not anticipate the Zangs patent. It is settled that "one's own work is not prior art under § 102(a) even though it has been disclosed to the public in a manner or form which otherwise would fall under § 102(a)," unless, of course, the disclosure occurred one year prior to the date of the application and thus constituted a statutory bar under Section 102(b). *In Re Katz*, 687 F.2d 450, 455 (C.C.P.A.1982); *In re Facius*, 408 F.2d 1396, 1406, 56 C.C.P.A. 1348 (1969); D. Chisum, *Patents* ¶ 3.08[2], 3–111.

### C.  *Obviousness*

EMPCO further contends that if claim 1 is not found to be literally anticipated by Lindblom and Olsson, it is at least obvious in light of the prior art, and that a number of the dependent claims are obvious as well.

■ In support of its position, EMPCO purports to have brought forth prior art more pertinent than that considered by the examiner, and claims, therefore, to have overcome the presumption of validity afforded the patent-in-suit. The defendant's

---

6. Section 102(a) provides:
    A person shall be entitled to a patent unless—
        (a) the invention was known or used by others in this country, or patented or describ-

ed in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

understanding of the law in this regard is incorrect. The statutory presumption of validity imposes the burden of persuasion at all times on one who attacks the validity of a patent. 35 U.S.C. § 282. The view of some circuits that the presumption of validity is destroyed upon the introduction into evidence of art more pertinent than that considered by the examiner has been "squarely rejected" by the Court of Appeals for the Federal Circuit. *RCA Corp. v. Applied Digital Data Systems, Inc.*, 730 F.2d 1440, 1443–1444 (Fed.Cir.1984). What a defendant may find upon the introduction of art more relevant than that considered by the examiner is that its burden of persuasion "may be carried more easily." *Id.* at 1444. The facts establishing obviousness must nevertheless be proven by clear and convincing evidence. *Id.*

■ The test of obviousness under 35 U.S.C. § 103 is whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). As explained in the *Graham* case, the following factual inquiries are to be made: 1) the scope and content of the prior art are to be determined; 2) differences between the prior art and the claims at issue are to be ascertained; and 3) the level of ordinary skill in the pertinent art is to be resolved. It is in light of these facts that a determination as to the obviousness of the subject matter as a whole is to be made. Secondary considerations, such as commercial success, long felt but unsolved needs, the failure of others, etc. may also be taken into account.

■ Applying the above test to the present case, I find that the defendant has failed to prove by clear and convincing evidence that the Zangs device was obvious.

### 1. *The Prior Art*

The prior art discloses a number of patents involving an array of different types of furnaces. The most pertinent of these are patents disclosing water cooled panels in electric arc furnaces. EMPCO introduced into evidence seven such patents.[7]

During the 1970's various attempts were made to replace refractory above the smelting zone in electric arc furnaces in whole or in part with water cooled elements. The seven patents relating to electric arc furnaces introduced at trial reflect this attempt. These patents can be categorized into three groups.

One group teaches so-called "cast-in" panels, in which the pipes intended to carry the cooling medium are literally embedded into cast iron or copper panels.[8]

A second type of panel is the so-called "box-type" panel, in which portions of the furnace wall are made up of hollow metal boxes through which water is channeled for cooling purposes.[9]

The Fukumoto patent (DX–25) would appear to represent a hybrid between the box and cast-in type of cooling panel. Fukumoto discloses a panel having a plurality of hollow water chambers running therethrough.

The majority of these references teach cooling panels that do not directly face the interior of the furnace. Instead, the interior of the furnace wall is ordinarily packed with refractory material. The cooling panels in turn are designed to cool the refractory and are placed behind the refractory for that purpose. Thus, one of the Nanjyo

---

7. Three of these patents Nanjyo (DX–3), German patent 2354570 (DX–12), which corresponds to DX–3, and German patent 250 2712 (DX–13) were cited to the examiner. Mizuno (DX–6), which was not cited to the examiner, is the U.S. patent corresponding to DX–13.

8. The two Nanjyo patents (DX–3, DX–31); German patent 2354570 (DX–12), which corresponds to DX–3.

9. Eisner (DX–7); Mizuno (DX–6), and corresponding German patent 2502712 (DX–13).

patents, (DX–31), a cast-in type of panel, teaches a cooling block into which are embedded refractory bricks that face the vessel's interior. Similarly, Eisner, (DX–7), a box-type panel, discloses panels that are covered over with a refractory composition prior to use. The wall panel of Fukumoto (DX–31) includes metal fins that protrude horizontally out from the panel toward the interior of the furnace. Refractory material is placed between the fins. Thus, in Fukumoto, while the top of the fins reach the interior of the furnace, the main body of the panel is insulated from the interior of the furnace by refractory.

On the other hand, the second Nanjyo patent, (DX–3), teaches several embodiments of the cast-in variety of cooling panel, one of which provides that the cooling block or panel itself faces the interior of the furnace without the interposition of refractory material. Mizuno (DX–6) similarly teaches a box-type panel that is directly exposed to the vessel's interior.

The defendant also introduced into evidence an assortment of patents relating to cooling apparati used in non-electric arc furnaces and boilers that were not considered by the examiner.

Dhelft (DX–8) discloses a cooling plate for a blast furnace. Defendant points to a modified form of the invention in which the cooling plate is comprised of a series of finned tubes that are welded together by each of their fins. The tubular plate is designed to cool refractory material that faces the interior of the blast furnace.

Babcock (DX–32) discloses a tubular heat exchanger in which is formed a complete bare tube wall that requires no refractory material and that absorbs heat from the furnace to vaporize liquid. Notably, Babcock teaches a series of metal tubes that are in or substantially in contact with one another. The patent indicates that Babcock is intended for use in the furnace wall of a vapor generator as well as the side wall of a horizontal combustion chamber.

The Lindblom and Olsson patents, previously discussed with regard to anticipation, are also emphasized by the defendant as relevant art not considered by the examiner. Both of those patents teach submerged arc furnaces that are equipped with a network of closely spaced cooling pipes that line the walls of the cover of the crucible. The purpose of the cooling tubes is to protect the cover of the furnace from the hot gases and fumes generated in the crucible below, as well as to provide efficient means to remove waste heat from the furnace so it can be used for other purposes such as the generation of electricity. Both patents further teach that the cooling tubes directly face the interior of the submerged arc furnace.

The defendants also introduced into evidence a patent, Ojima (DX–54), relating to a boiler for a metallurgical furnace that discloses heat exchange elements made up of a series of tubes connected together in a contacting position. Such a boiler is typically situated outside of the furnace proper and is designed to collect and cool the high temperature gas generated by the furnace, as well as to ensure efficient heat recovery. (Tr. 383, 392).

Defendant also cites Woodard (DX–22), a locomotive boiler, that again discloses panels of tubes or coils in contacting position. Apparently, these coil panels function to absorb heat for the production of steam.

With respect to non-electric arc furnace prior art that was considered by the examiner, only Hennenberger (DX–2) is worth discussing. Hennenberger relates to a rotary furnace and discloses water cooled pipes facing the interior of the furnace. The tubes are considerably spaced. They function to cool the melt impinging upon the walls of the furnace. The cooled melt in turn solidifies around the tubes and between the tubes and sides of the furnace shell to form a protective layer.

2. *Level Of Ordinary Skill In The Art*

The parties do not dispute the level of ordinary skill in the art of electric arc furnaces. One of plaintiff's technical experts, Mr. Lovgren, testified as to the level of

skill in the art in 1977. EMPCO has agreed with Mr. Lovgren's testimony.[10]

Mr. Lovgren has a degree in chemical engineering as well as a very extensive background in the steel industry, and more particularly, in the technology of electric arc furnaces. During part of his career he was employed by an electric arc furnace manufacturer to develop its engineering capabilities. Some years later, around 1969, he became President of Electro-Melt Company, one of the largest manufacturers of electric arc furnaces. He has also acted as an engineering consultant to electric arc furnace projects throughout the world.

Lovgren testified from personal knowledge about the four companies in this country involved in the design of electric arc furnaces around October, 1977. Lovgren explained that only two of these, Electro-Melt and Swindell-Dressler, were actually competitive with respect to the manufacture of large electric arc furnaces. Mr. Lovgren was personally familiar with a number of the designers working for these two organizations. He testified that all were degreed engineers having anywhere from five to twenty years experience with electric arc furnaces. He further indicated that the training and experience of these individuals defined the level of ordinary skill in the electric arc furnace design art in and about October, 1977 in the United States. (Tr. 470–476).

### 3. The Differences Between The Prior Art And The Subject Matter Claimed

The Zangs patent essentially teaches a vessel for an electric arc furnace having an interior wall which consists of a cooling pipe coil. It is clear from claim 1, the diagrams and specifications of the patent, as well as the August 6, 1979 amendment, that the Zangs coil panel is designed to act as a wall of the furnace, and obviates the need for refractory above the smelting zone.

The prior art relating to electric arc furnaces that EMPCO claims is more pertinent than that before the examiner, as well as

the prior art before the examiner during the prosecution of the patent-in-suit, is significantly different in design from the Zangs invention. Clearly, nothing in the prior art discloses a cooling panel consisting of pipe coil that forms the interior wall of an electric arc furnace.

As previously discussed, the most pertinent prior art involving electric arc furnaces disclosed box-type or cast-in panels. While the cast-in panels disclosed pipes, these pipes were embedded in the interior of the metal block itself. Thus, the function of the pipes was to cool the main body of the cast metal; accordingly, the pipes were not themselves the fundamental structural element that formed the interior wall of the furnace. In the box-type panels, there are no pipes whatever; rather, the panels are simply hollow boxes established by metal plates. In addition, as previously discussed, a number of these prior art electric arc furnace cooling panels do not directly face the interior of the furnace vessel as does the Zangs device. Instead, they are separated from the interior of the furnace by a layer of refractory material.

EMPCO, however, does not seek to prove obviousness solely on the basis of the prior art relating to cooling panels found in electric arc furnaces. EMPCO points out that the cooling pipes found in the non-electric arc furnace prior art are typically described by the industry as "heat-exchangers," because of the manner in which they function. EMPCO insists that the cooling pipe coil disclosed by the patent-in-suit is similarly a "heat exchanger". EMPCO thus argues that since both the cooling pipes found in non-electric arc furnaces and the Zangs cooling pipe coil are "heat exchangers," it would have been obvious to one skilled in the art to substitute the cooling pipes known in the non-electric arc furnace industry for the box-type or cast-in panels disclosed in the prior art relating to electric arc furnaces.

Mannesmann vigorously takes issue with defendant's characterization of its cooling

---

**10.** Defendant's Answering Post-Trial Brief at 21.

pipe coil as a "heat exchanger," comparable to those known in the non-electric arc furnace industry. While EMPCO correctly points out that the pipe panel heat exchangers that it has cited resemble the cooling pipe coil of the patent-in-suit, I am not persuaded that it would have been obvious to one with ordinary skill in the art to transfer the pipe panel heat exchangers found in boilers and non-electric arc furnaces, such as Babcock, Lindblom or Woodard, into the interior of an electric arc furnace for the purpose of forming an interior wall.

Regardless how one characterizes the pipe panels cited by EMPCO, as compared to those disclosed by the patent-in-suit, it is clear that the heat exchange functions of the two are conceptually quite different. The primary purpose of the Zangs invention is to form a wall in an electric arc furnace. The heat exchange function that occurs with respect to Zangs, namely the cooling of the panel via the forced circulation of cooling medium, is necessary as a means of preserving the device itself from the intense heat generated by the electric arc furnace.

In contrast, the so-called "heat exchangers" cited by EMPCO serve a different purpose; the heat exchange functions of these pipe panels is not designed to preserve the panels themselves. Indeed, unlike the Zangs device, the structural integrity of the pipe panels taught for non-electric arc furnaces would not appear to be threatened by the thermal conditions of their respective environments. Rather, these panels appear to function either as a means of conserving waste heat or as a means of transforming the heat of combustion into a more useful form of energy.[11]

For example, Woodard discloses a pipe panel for a locomotive boiler that is designed to absorb the heat of combustion for the purpose of producing steam for locomotion. The Babcock panel would appear to function like Woodard—the pipe cooling panels are designed to absorb the heat from a furnace for the purpose of producing vapor.

The cooling coils of Lindblom and Olsson serve to absorb the excess waste heat generated by a submerged arc furnace. This heat is transferred to the cooling medium and is carried to a boiler where it is conserved for other purposes, such as the generation of electricity.

Ojima (DX–54) would appear to function similarly to Lindblom and Olsson. Here, hot gases pass from a furnace and come in contact with the pipe panel of a boiler. The cooling medium running through the pipes absorbs the heat and thereby conserves energy.

Mr. Fettweiss, the plaintiff's technical expert testified that the conventional heat exchangers cited by EMPCO were not relevant to the design of the Zangs device. He explained that a typical heat exchanger, such as Lindblom and Olsson, functions to conserve energy by transporting waste heat from one system to another. In contrast, the Zangs device seeks the opposite effect, namely to preserve as much heat as possible within the electric arc furnace. (Tr. 384, 389–393). Fettweiss pointed out that ordinary heat exchangers have an 80% efficiency rate in transferring heat from one system to another. The Zangs device, on the other hand, since it attempts to minimize the loss of heat, permits the transfer of only 3% of the heat generated in the furnace. This 3% loss results from the use of the cooling pipe coil itself. (Tr. 390–392).

Thus, it is clear that the only heat exchange that occurs with respect to the Zangs device is the cooling of the pipe coil itself, and that this function is necessitated by the extreme thermal conditions of the

11. I recognize that the cooling pipes found in Olsson and Lindblom also function to protect the covers of the submerged arc furnaces from significant heat stresses generated therein. However, both plaintiff's experts testified that the temperature in a submerged arc furnace is substantially less than that of an electric arc furnace. Mr. Fettweiss testified that temperatures in submerged arc furnaces range between 600–1,100 ° F, whereas temperatures in an electric arc furnace range between 3,500–11,000 ° F. (Tr. 384–386, 466).

electric arc furnace. EMPCO has not brought to light a single reference that discloses a pipe panel that acts as a wall and exchanges heat only to the extent necessary to preserve itself from intense thermal conditions. Since the heat exchangers cited by EMPCO function quite differently from the Zangs device, I am not persuaded that it would have been obvious to one with ordinary skill in the art to substitute the pipe panel heat exchangers found in the prior art relating to boilers and non-electric arc furnaces for the box-type and cast-in cooling panels disclosed by the electric arc furnace prior art.

The cooling pipes disclosed in non-electric arc furnaces prior art fail to render the patent-in-suit obvious for a second reason. The mechanical stresses encountered in an electric arc furnace are significantly greater that those encountered in a non-electric arc furnace or boiler. Mr. Fettweiss testified that these mechanical stresses are an important factor that an inventor must consider in designing an electric arc furnace. (Tr. 388–389). Fettweiss estimated that up to 80 tons of scrap metal can be dumped at one time into an electric arc furnace, and that individual ingots can weigh up to six tons (Tr. 388). He stated that the panels of the furnace must be designed to withstand the "massive" and "tremendous impact" that results from the dumping of scrap. (Tr. 388). The defendant has not persuaded me that it would have been obvious that the pipe panels found in non-electric arc furnaces would be capable of enduring the extreme mechanical stresses typical of an electric arc furnace. Clearly, EMPCO has not brought forth any art disclosing the use of pipe panels that have the structural integrity of a wall in environments comparable to that of an electric arc furnace. Indeed, Mr. Fettweiss testified that one of the reasons that the box-type panels were developed for electric arc furnaces was because of the commonly held notion that pipe panels would not be able to withstand the mechanical stresses encountered in electric arc furnaces. (Tr. 395).

Defendant also argues that it would have been obvious to substitute the cooling panels of prior electric arc furnaces with the cooling coils disclosed in Dheflt (DX–8). In one of its embodiments, Dheflt discloses a series of closely spaced tubes that function to cool refractory in a blast furnace. However, the cooling pipes in this disclosure primarily function to cool refractory and therefore do not suggest a wall actually constructed of such cooling pipes. Moreover, a blast furnace, as explained by both of Mannesmann's expert witnesses, is characterized by a significantly milder environment than that of an electric arc furnace. (Tr. 402–404, 462–463).

The burden is on the defendant to prove obviousness by clear and convincing evidence. Mr. Wunsche, the President of EMPCO, and the defendant's technical expert did not discuss the relative pertinence of the prior art. Mr. Frost, defendant's second expert, did testify that it would have been obvious to substitute the prior cooling panels of electric arc furnaces with the pipe elements found in various non-electric arc furnaces. As previously noted, however, Mr. Frost candidly acknowledged, that he was not a technical expert in the field of electric arc furnaces: "As a technical man in the sense of a design engineer, engineering expert in arc furnaces, I don't intend to be either." (Tr. 372). In contrast, Mannesmann presented the testimony of two individuals with extensive knowledge concerning the design and function of electric arc furnaces. Both experts agreed that the references cited by EMPCO were not more pertinent than the prior art before the examiner.

### 4. Secondary Considerations

*Graham v. John Deere,* 383 U.S. at 17–18, 86 S.Ct. at 693–694, also suggests inquiring into "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc." as possibly relevant circumstantial evidence of obviousness or nonobviousness.

In the present case, several secondary considerations provide support for a finding that EMPCO has failed to carry its burden.

Mr. Fettweiss, the U.S. product manager for plaintiff's electric arc furnaces, testified that the amount of sales of Dr. Zangs TW 2000 system is approximately $20 million worldwide, with half of those sales occurring in this country. Plaintiff also introduced into evidence a commercial reference list published by Mannesmann Demag that itemizes over 170 installations of the TW 2000 system throughout the world from 1977 through February 1984. (PX–6).

As to "long felt need", Mr. Wunsche himself provided testimony. He testified that efforts were made by numerous manufacturers in different countries to improve upon the early box-type panels introduced into the electric arc furnace market around 1974 and 1975:

> ... As a matter of fact, that start from the Korf-Fuchs gave all the people involved in the electric arc furnace building some kind of desire to have their water-cooled element of their own.... And it was also several producers in Italy, in Sweden, in France, several plants did their own design. So there was a time when it was the time of searching for something better.
>
> Q. What year period are you speaking of here?
>
> A. It is the time starting '73, '74, '75, '76. It is quite a long period. The steel industry is very conservative. They are not prepared to—very few plants are prepared to be pioneers, to accept something which came only from engineering.

(Tr. 232) [12]

In light of the test set out in *Graham v. Deere*, I conclude that the defendant has failed to prove obviousness by clear and convincing evidence.

## III. INFRINGEMENT

Mannesmann claims that the EMPCO device literally infringes claims 1, 2, 5–12, 14, 15, 18 and 19 of the Zangs patent. Alternatively, Mannesmann argues that if there is no literal infringement, the accused structure nonetheless infringes these claims under the doctrine of equivalents.

The focus of trial, with respect to the claim of infringement was on claim 1, which is an independent claim. The remainder of the claims are dependent claims and include the limitations of claim 1 by reference. Accordingly, if claim 1 is not infringed, it follows that none of the other claims are infringed.

■ Defendant EMPCO denys infringement on the grounds that (1) EMPCO panels are not in a "contacting relation", since each EMPCO panel pipe section is separated from its neighbor by a slag stopping or spacer bar as well as a small gap, and that (2) as a result of the word "consisting", claim 1 cannot read on the EMPCO panels, because such panels include additional structures not called for by claim 1. EMPCO further contends that the doctrine of file wrapper estoppel bars Mannesmann from resorting to the doctrine of equivalents to extend the reach of claim 1. The burden is upon the plaintiff to prove infringement by a preponderance of the evidence. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983).

### A. *Literal Infringement*

■ In its entirety, claim 1 reads:

A vessel for a metal smelting furnace having a smelting zone including a heat-resistant interior wall, and cooling means for protecting the interior of said vessel, characterized by

(a) at least a portion of the interior wall of said vessel above the smelting zone consisting of at least one cooling pipe coil;

(b) said coil including fluid passage-forming sections;

---

**12.** An additional secondary consideration worth noting is Mr. Wunsche's own testimony concerning his efforts to design the accused device. Mr. Wunsche stated that the accused device evolved "over a long period. It was not over-night. We are talking about two, three years." (Tr. 240). That Mr. Wunsche acknowledged that his invention took a "long period" to evolve further militates against a finding of obviousness.

(c) said cooling pipe coil being exposed to the center of the vessel, and

(d) neighboring sections of said coil being arranged in a contacting relation.

The accused device is a water cooled pipe panel for use in an electric arc furnace. The panel comprises a plurality of eccentrically spaced pipes. Each pipe is separated from its neighbor by a space, which EMPCO claims has the important function of acting as a dovetail shaped keyway to receive and anchor a protective layer of solidified slag on the pipes. The dovetail-shaped spaces or keyways between the pipe sections are completed by a slag-stopping or spacer bar which partially fills the space between adjacent pipes and which is designed to prevent the egress of slag through the panel itself. Thus, neighboring pipe sections of the EMPCO panel are *not* literally touching. The accused structure also includes a backbone bar, which is a metal bar designed as a means of support that is welded to alternate pipe sections on the exterior face of the panel.

At the outset, it is necessary to determine the meaning of the phrase "in a contacting relation" as used in claim 1 of the patent-in-suit. EMPCO contends that the phrase requires that adjacent pipe sections be in physical contact. Mannesmann contends, however, that the phrase does not require actual physical touching, but merely that adjacent sections of the pipe coil are close enough to prevent slag from flowing through the panel itself. I conclude that the phrase in question requires actual physical contact.

The phrase in clause (d) of claim 1, "in a contacting relation," appeared by way of an amendment filed August 6, 1979, (DX–63) in response to the Patent Office examiner's rejection of claim 26 (which ultimately became claim 1 of the patent-in-suit) on the ground of indefiniteness under 35 U.S.C. § 112, and on the ground of obviousness under 35 U.S.C. § 103. The final

clause of claim 26 had read "neighboring sections of said coil being arranged in a closely adjacent relation." The examiner found "closely adjacent" indefinite, since the phrase is "a difference in degree or a matter of opinion." The examiner also rejected "closely adjacent" as obvious, citing several references disclosing "closely spaced" cooling pipes. Accordingly, the applicant changed claim 26 from "neighboring sections of said coil being arranged *in a closely adjacent relation*" to "neighboring sections of said coil being arranged *in a contacting relation.*"

The August 6, 1979 Amendment strongly supports EMPCO's position that "in a contacting relation" requires actual physical touching. The term "contacting" was intended as a limiting term in place of the term "closely adjacent," and it necessarily draws its definition from that substitution. Its meaning, therefore, cannot now be enlarged to encompass the broader term that it was meant to replace.

Some additional support for this interpretation of the meaning of "in a contacting relation" is found in one of the diagrams in the patent-in-suit and its accompanying description. Figure 2 of the patent appears to show the adjoining pipe sections of the coil welded together. Figure 2 is described in the patent as follows: "FIG. 2 is a side cross-sectional view of the coil 1 of FIG. 1 and illustrates the manner in which the individual pipe sections 2 are welded together."

It is also well to note that the ordinary meaning of the term "contact" denotes actual physical touching.[13]

Finally, I recognize that other portions of the specifications lend support to Mannesmann's position that "contacting" does not require actual physical touching;[14] nonetheless, I conclude, particularly in light of the August 6, 1979 Amendment, that the

**13.** Webster's Third New International Dictionary 490 (P. Gove ed. 1971).

**14.** At one point in the specifications, the panel is described as "... pipe sections arranged in a

closely adjacent relation." (PX–9, col. 2, 27–28). Further on the specifications state: "The pipe coils *may* be interconnected by welding." (PX–9, col. 2, 49–50) (emphasis supplied).

applicant defined "in a contacting relation" to mean physical touching.

Because of the space between neighboring pipes, EMPCO contends that its panels do not include the structure demanded by the last clause of claim 1: "neighboring sections of said coil being arranged in a contacting relation."

Mannesmann contends, however, that claim 1 does not call for the neighboring *pipes* to be in a contacting relation, but rather for "neighboring *sections of said coil* being arranged in a contacting relation." Mannesmann argues that, with regard to defendant's panel, each neighboring coil section is comprised of a pipe welded to a slag stopping bar, and that when viewed in this light, the accused device satisfies the requisite "in a contacting relation." I disagree.

While Mannesmann's interpretation of clause (d) of claim 1 is not unreasonable, when read in the entire context of claim 1 as well as the Zangs patent specifications, it is clear that by "neighboring sections of said coil" the applicant was referring to pipes. Both clause (a) and (c) refer to pipe coil. Although the clause in dispute does not specifically speak of pipe coil, it is clear that the coil referred to in clause (d) is the same coil referred to in clause (a) and (c). The patent specifications provide further support for this interpretation, particularly the description of the diagram in the patent showing the cooling pipe coil panel itself: [15]

Referring initially to FIG 1, there is illustrated a cooling pipe coil 1 forming a part of the vessel interior wall according to the invention. Cooling pipe coil 1 comprises a plurality of closely adjacent, individual pipe sections 2, preferably welded together. Each pipe section 2 includes two open ends and caps 3 are welded to the open pipe ends to provide flow between neighboring pipe sections 2. The

cooling pipe coil 1 is connected to a down pipe 4, through which the cooling water is fed under high pressure to the lowermost pipe section 2. Cooling water outlet 6 is provided at one end of the uppermost pipe section 2 of the cooling pipe coil 1.

I therefore find that the space existing between the neighboring pipes of the EMPCO panel resulting from the placement of a slag stopping bar therebetween avoids literal infringement of the Zangs patent.

EMPCO also contends that its panels avoid literal infringement because of the alleged presence of a small gap that separates each combination of cooling pipe and spacer bar from its neighbor. Mannesmann disputes that such a gap in fact exists.

Mannesmann points out that the original production drawings of the EMPCO panels (PX–33, 34, 37, 39) and the original patent drawings of the accused device (PX–102) do not show a gap between each neighboring combination of spacer bar and pipe. More significantly, both PX–34 and the original patent drawings reveal welds on both sides of the spacer bar so that, at least according to these drawings, a gap could not exist between the spacer bar and one of the neighboring pipes.

EMPCO points out, on the other hand, that PX–33, while admittedly not showing an actual gap, does show welding between only one of the neighboring pipes and the slag stopping bar, which, EMPCO claims, represents the correct welding procedure. Also, in response to formal objections to its original patent application drawings, EMPCO submitted corrected drawings that now show not only welding on only one side of the slag stopping bar, but also a small gap separating the bar from the non-welded neighboring pipe section. (PX–102).[16]

15. See also column 2, lines 23–68.

16. The examiner objected to the original drawings as "informal," since two of the figures were "connected" and several others showed "spots" and "double line hatching". Evidently, in responding to these objections, Wunsche also took

the opportunity to eliminate the depiction of the double welding, as well as to illustrate a gap between one of the pipes and the slag stopping bar—which he had sometime earlier realized was a mistake. (Tr. 147–149).

Mr. Wunsche testified that both the original patent drawings and the EMPCO panel production drawings showing double welding of the slag stopping bar to both neighboring pipe sections were in error. (Tr. 147–148, 152). Wunsche contended that EMPCO had "never" welded neighboring pairs of pipes to the same slag stopping bar. (Tr. 152). He explained that EMPCO intentionally welded the bar to only one adjacent pipe to ensure flexibility and thereby avoid cracking of the panel structure. (Tr. 152–154, 182, 186). According to Wunsche, the slag stopping bars were purposefully spaced from one of the adjoining pipes by the use of a ¹⁄₃₂ of an inch feeler gauge and that it was acceptable for the resulting space to be as large as ¹⁄₁₆ of an inch. (Tr. 179, 181, 190).

I credit Mr. Wunsche's testimony that a gap in fact existed between each slag stopping bar and one of its neighboring pipe sections in the accused panels, and that the original patent drawings as well as the EMPCO panel production drawings that show double welding were in error.[17] Thus, even were I to accept Mannesmann's argument that the combination of a slag stopping bar welded to a pipe constituted a section of a coil within the meaning of clause (d) of claim 1, I would nonetheless rule against literal infringement since each such combination in the accused device was separated from its neighbor by a small gap, and would not, therefore, be in a "contacting relation."

The defendant further claims that its accused panels avoid literal infringement because of the "consisting of" language appearing in clause (a) of claim 1, which reads as follows:

(a) at least a portion of the interior wall of said vessel above the smelting zone consisting of at least one cooling pipe coil.

EMPCO contends that the phrase "consisting of" is an exclusionary term in the language of patent claims that prevents a claim from reading on any embodiment that includes additional structures. Accordingly, EMPCO argues that claim 1 cannot read on the accused device because it includes additional structures not disclosed by claim 1, namely the slag stopping bar and the backbone bar.

When the phrase "consisting of" appears in the *transitional phrase* of a claim, the claim is considered "closed" to additional structures. A claim which is closed to additional structures cannot read on embodiments possessing any structure not expressly disclosed by the claim. P. Rosenberg, 2 *Patent Law Fundamentals*, § 14.05[2] (1984); D. Chisum, 2 *Patents* § 8.06[1][b] (1984). In the present case, the "consisting of" phrase does not appear in the transition phrase of the claim, but rather in the body of the claim as one of its limitations. The transition phrase of claim 1 of the patent-in-suit is the phrase "characterized by". The defendant has pointed to no authority and I know of none standing for the proposition that the transitional phrase "characterized by" acts to close a claim to its recited elements and nothing further.

**17.** Further support for this finding is provided by a number of photographs (DX–123) as well as a model of the accused panel (DX–122) submitted into evidence by EMPCO. Both the model and two of the photographs (DX–123, Nos. 15, 16) show welding between the spacer bar and only one of the neighboring pipe sections. The model also clearly showed a gap between the spacer bar and the neighboring pipe section to which it was not welded. With regard to the two photographs, Mr. Wunsche stated that they showed a panel that was shipped to a customer. He further indicated that he was not aware of any EMPCO panel that had been manufactured differently from the one pictured in the two photographs. (Tr. 205–206). As to the model of the accused device, Mr. Wunsche testified that the model was manufactured according to "all standard procedure," and that all of its details "correspond[ed] to current production." (Tr. 207).

Mannesmann also points out that the model of the accused device introduced into evidence (DX–122) shows a gap in excess of the ¹⁄₁₆" acceptable tolerance, notwithstanding that Mr. Wunsche said that the model corresponds in all details to current production (Tr. 207). While Mannesmann points to a slight inconsistency in the defendant's case, that inconsistency certainly does not support its position that no gap in fact exists.

The file wrapper of the patent-in-suit sheds some light on the meaning of the term "consisting of" as used in claim 1. The term was introduced by way of the August 6, 1979 Amendment, (DX–63) to distinguish the Zangs invention over references, such as Hennenberger (DX–2), that disclose "composite" wall structures. The Hennenberger patent discloses a shall to which is attached cooling coils. The purpose of the Hennenberger coils is to cool and solidify a protective layer of slag that adheres to the coils and the furnace shell itself. It is the shell, not the cooling coils, that forms the structural wall of the vessel disclosed by the Hennenberger patent. The "consisting of" language as it appears in claim 1 of the patent-in-suit was introduced to illustrate that the Zangs vessel was not a shell cooled by pipes, but was structurally established, at least in part, by the pipe coils themselves. Thus, the "consisting of" language was invoked by the applicant to emphasize that the Zangs coil is the *wall* itself. When viewed in this light, the term "consisting of" is exclusionary only to the extent that it teaches a cooling pipe coil that by itself forms the interior wall of a vessel. I do not view the term, however, as excluding additions to the pipe coil, such as EMPCO's slag stopping or backbone bars, that would not detract from its structural integrity as a *wall*.

I, therefore, reject EMPCO's argument that its accused panels avoid literal infringement because of the inclusion of elements not disclosed by claim 1 of the patent-in-suit, namely the slag stopping and backbone bars.

### B. *File Wrapper Estoppel*

█ As previously discussed, the language of claim 1, "in a contacting relation," was introduced as a limiting amendment in response to the examiner's rejection of the phrase "in a closely adjacent relation." EMPCO thus argues that the doctrine of file wrapper estoppel bars Mannesmann from invoking the doctrine of equivalents to broaden the literal reach of claim 1 to read on any embodiment that does not teach pipe coils "in a contacting relation," that is, actual physical touching. Mannesmann counters that file wrapper estoppel does not automatically deprive it of complete resort to the doctrine of equivalents, and that it is still entitled to equivalents that are more limited in scope than the claim upon which the examiner based his or her rejection. While Mannesmann correctly states the law,[18] the circumstances in the present case do not permit the plaintiff to broaden the amended claim 1 to read upon the EMPCO device.

The examiner rejected the "closely adjacent" language on obviousness grounds in light of the principal applied reference, Hennenberger (DX–1), considered in view of the Moore Patent, (DX–2) and the German patent 1 029 020 (DX–11). The examiner stated his rejection as follows: Tubes 2 [of Hennenberger] may be closely spaced (see col. 2, lines 45–50). Closer spacing may be used in [Hennenberger] as suggested by passageways 81 of [Moore] or passageways 1, 5, 6, 10, 11 and 12 of German patent 1 029 020.

Thus, it is clear that in response to the examiner's rejection of the language "closely adjacent," the applicant narrowed claim 1 to teach a device showing pipe sections "in a contacting relation." Notwithstanding this limitation by amendment, Mannesmann contends that the meaning of "in a contacting relation" can be fairly broadened to encompass equivalent devices, such as the accused panels, "where neighboring sections are *close enough to constitute a barrier*" to the egress of slag.[19] However, were Mannesmann allowed such a broad construction of the limiting language, it would manage to reclaim the very thing it surrendered by way of amendment, since claim 1 as originally written similarly contemplated no more

---

**18.** *Bayer Aktiengesellschaft v. Duphar Intern. Research,* 738 F.2d 1237, 1242–43 (Fed.Cir.1984); *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362–63 (Fed.Cir.1983).

**19.** Plaintiff's Post-Trial Answering Brief at 18 (emphasis supplied by plaintiff).

than that neighboring pipe sections would be "close enough to constitute a barrier" to slag. Mannesmann has argued all along that the patent-in-suit primarily teaches a cooling pipe coil that forms a *wall*; and it is clear that as a wall the Zangs invention was intended to prevent the egress of slag. Thus, the "closely adjacent" language of the original claim necessarily envisioned spaces between neighboring pipe sections that were also sufficiently narrow to prevent the flow of slag through the panel. Mannesmann, therefore, attempts to regain the original scope of the rejected claim, when it argues that amended claim 1 can be broadened to read on equivalents that show spaces between pipe sections that are nonetheless close enough to prevent the egress of slag.

With respect to a limiting amendment brought on by an examiner's rejection of a claim on obviousness grounds, the Supreme Court has stated:

> The difference which [the patentee] thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed against him.

*Exhibit Supply Co. v. ACE Corp.*, 315 U.S. 126, 137, 62 S.Ct. 513, 519, 86 L.Ed. 736 (1942). To broaden claim 1 of the patent-in-suit to read on the "closely adjacent" neighboring pipe sections of the accused device, would ignore the Supreme Court's directive that amendments in claim language to meet objections by the Patent Office must be deemed *"material"* and *"strictly construed"* against the patentee. It follows that the accused device does not infringe.

## IV. DUTY OF CANDOR ISSUE

EMPCO alleges that the applicant for the patent-in-suit violated his duty of candor in failing to bring relevant art to the examiner's attention, and in failing to bring other relevant art before the examiner in a timely fashion. EMPCO insists that the appli-

cant's conduct constitutes inequitable conduct and should bar enforcement of the patent-in-suit, as well as mandate an award of attorneys fees.

"Establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO." *Orthopedic Equip. Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1383 (Fed.Cir.1983). And, while the materiality and intent elements of inequitable conduct can be proved with less than that required to prove common law fraud, "mere evidence of simple negligence, oversight, or an erroneous judgment made in good faith not to disclose prior art" will not render a patent unenforceable. *Id.*[20]

In determining whether an applicant's conduct before the PTO has been inequitable, both the degree of materiality of the information withheld and the level of culpability of the applicant in withholding such information must be assessed. The Federal Circuit has recently held that the ultimate outcome of this inquiry depends on a balancing of these two elements. *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1362–1363 (Fed.Cir.); *cert. denied, Sowa & Sons, Inc. v. American Hoist & Derrick Co.*, — U.S. —, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). Thus, where the information withheld is extremely material, the level of culpability necessary to establish inequitable conduct declines, and vice-versa. *Id.* In *Austin Powder Co. v. Atlas Powder Co.*, 593 F.Supp. 208, 212 (D.Del.1984), I recently had occasion to analyze the import of *American Hoist* as follows:

> [The Court of Appeals for the Federal Circuit] explicitly or implicitly recognizes five stations along the continuum of materiality: (1) information which is not rel-

**20.** As will be discussed, *infra*, the Court of Appeals for the Federal Circuit has more recently intimated that a level of scienter less than gross negligence may permit a finding of fraud if the misrepresentation or information withheld would have been so material as to render the patent invalid.

evant to the issues of patentability, (2) information which is relevant to those issues but cumulative, (3) information which is sufficiently relevant and non-cumulative that a reasonable examiner would want to know about it but which, upon consideration, he would not consider important in his decision making process, (4) information which a reasonable examiner would consider important in his decision making process but which does not make the invention unpatentable, and (5) information which makes the invention unpatentable. Moreover, the Court suggests that when the information at issue falls below the first three of these stations on the continuum of materiality, the challenge to the validity of a patent should ordinarily be rejected without reference to the state of mind of the one charged with misconduct. When the information at issue falls in the range of the fourth station, the patent should ordinarily be declared invalid where there has been a deliberate intent to mislead, but ordinarily not otherwise. Finally, the Court intimates that if the information is such that it would have caused rejection of one or more claims, even a showing of less culpability than gross negligence may suffice.

EMPCO's first argument relates to German patent OS No. 2 502 712 (the " '712 patent") (DX–13), a German language copy of which was provided to the examiner. EMPCO claims that the applicant's description of the '712 patent in the patent-in-suit is misleading since the applicant failed to mention that molten slag is spattered on the water-cooled panel of the '712 patent and is retained and solidified with the aid of the projecting finds (illustrated in Figure 2 of DX–13), so that the solidified slag forms a protective layer on the panel. EMPCO further alleges that the applicant presented this concept of slag adherence in the patent-in-suit in such a way that the U.S. examiner would have concluded that the concept originated with Dr. Zangs.

EMPCO's first allegations fails for several reasons. First, the applicant's duty of candor did not require him to describe the slag adhering characteristics of the '712 patent in the patent-in-suit. The primary teaching of Zangs is a vessel with a cooling pipe coil wall, and the '712 patent is more than adequately described in light of this teaching. The slag adhering characteristics of prior art are hardly relevant to the novelty of the patent-in-suit. Further, I do not read the Zangs patent as leaving the impression that Dr. Zangs originated the concept of cooling slag for purposes of forming a protective layer on the furnace wall. In any event, the applicant provided the examiner with the Nanjyo patent (DX–3), which would have alerted the examiner to the fact that the concept of solidifying slag on cooling panels for the panels' protection was known in the electric arc furnace prior art.

EMPCO's second contention is that the applicant should have disclosed the Demag brochure (PX–8) to the examiner and should have proved that Dr. Zangs was the source of disclosures therein, even if, as I have found, the date of the publication does not constitute a statutory bar. In pressing this argument, EMPCO points to no authority for the proposition that an inventor must produce every publication relating to his or her invention, and further prove that he or she is the author thereof. It would seem that the required inventor's oath satisfies the applicant's duty of candor in this regard, and that no more is required.

EMPCO also claims that the Demag brochure contained significant disclosures that should have been brought to the attention of the examiner. The third paragraph of page two of the translation of the brochure (PX–8) reads as follows:

> The development of the Demag tube wall system is based on Demag's decades of experience in water cooling in cooling systems for blast furnaces, ingot molds for continuous casting installations, converter stacks and arc furnaces.

EMPCO claims that disclosure of the above to the examiner would have alerted him to the relevance of blast furnaces, ingot

molds, converter stacks and submerged arc furnaces.

This argument also must fail. First, the applicant did provide the examiner a fair sampling of prior art relating to non-electric arc furnaces disclosing the use of cooling pipe coils, namely Hennenberger (DX-2), Moore (DX-1), Eysn (DX-4), and German patent 1 029 020 (DX-11). While these references do not specifically include a converter stack, a submerged arc furnace or an ingot mold, they do represent four distinct non-electric arc furnaces utilizing cooling pipes.[21] In addition, several of the references disclose cooling pipes having distinct functions. For example, the Hennenberger pipes are designed to cool slag so that a protective layer solidifies around the pipes and against the vessel wall. In Moore, the cooling tubes are cast directly in the inner shell of a iron melting cupola and thereby protect the inner shell from heat and obviate the need for refractory materials. I find that these references cited by the applicant would have adequately apprised the examiner about the use of cooling pipes in non-electric arc furnaces. Thus, while the examiner may have found the devices disclosed in the Demag brochure relevant, I conclude that the examiner would have also found them cumulative and therefore not sufficiently material to warrant the Court's concern.

EMPCO also appears to argue that, because of this disclosure in the Demag brochure, the applicant's attorney acted improperly in arguing against the relevance of non-electric arc furnaces. (See amendment, filed August 6, 1979, in DX-63). I disagree. I do not consider the statement in the Demag brochure, which is a commercial advertisement, a determinant of what constitutes relevant prior art under the patent law. A manufacturer may have any number of reasons for introducing a new product as having evolved from prior technology with which the manufacturer is familiar. Certainly such a commercial announcement does not constitute a legal admission about the relevant art that an applicant is obligated to disclose and abide by in prosecuting a patent.

EMPCO bases its last allegation on the filing of a Supplemental Prior Art Statement by the applicant several months after the October 11, 1979 notice of allowance. This Supplemental Statement consists of three German patents, only one of which was provided with an English translation. One of the untranslated patents, German AS No. 1 136 723 (DX-16), had been cited by the German Patent Office in the German Patent Office Action, dated September 13, 1978, in the corresponding German priority application No. P 27 45 622.0-24 (DX-65, part 9).[22] This patent discloses cooling pipes for the chimney of a converter. One of the other patents, German patent 1 013 680 (DX-17), discloses cooling pipe coils for use in the masonry of blast furnaces. Both patents disclose cooling pipes for non-electric arc furnaces. As previously noted, the applicant provided the examiner with several patents disclosing the use of cooling pipes in non-electric arc furnaces. While additional art relating to non-electric arc furnaces such as DX-16 and DX-17 may have been relevant to the examiner, such additional art would have also been cumulative.

■ In sum, with regard to the question of materiality, I conclude that the applicant did not withhold information that the examiner would have considered important in his decision-making. *American Hoist* suggests that in such a case the challenge to the enforceability of the patent on grounds of fraud or inequitable conduct should be dismissed without further inquiry into the applicant's state of mind. It is apparent, however, from the prior art which the applicant did disclose that there was no intent to mislead the P.T.O.

---

**21.** Eysn (DX-4) relates to a metallurgical vessel, particularly to a converter. In its brief, EMPCO asserts that Eysn discloses a blast furnace. Defendant's Opening Post-Trial Brief at 35.

**22.** Indeed, DX-16 was partly relied upon by the German Patent Office in initially rejecting the corresponding German application.

Accordingly, the patent-in-suit is enforceable and EMPCO is not entitled to attorney's fees.

## CONCLUSION

For the foregoing reasons, I conclude that the Zangs patent is valid and enforceable. I also conclude, however, that the accused device does not literally infringe the patent-in-suit. Furthermore, the doctrine of file wrapper estoppel bars the plaintiff from proving infringement under the doctrine of equivalents.